**Sidney T. BERNSTEIN, Appellant,**

v.

**PORTLAND SAVINGS AND LOAN ASSOCIATION, Appellee.**

No. 13–91–336–CV.

Court of Appeals of Texas, Corpus Christi.

March 4, 1993.

Rehearing Overruled April 15, 1993.

Richard Crews, Jr., Douglas Kennedy, Thomas Nye, Brin & Brin, Corpus Christi, for appellant.

J. Norman Thomas, Harris & Thomas, Corpus Christi, for appellee.

Before KENNEDY, DORSEY and FEDERICO HINOJOSA, Jr., JJ.

## OPINION

KENNEDY, Justice.

After a jury trial, the trial court entered judgment for Portland Savings and Loan Association (Portland) and against Sidney Bernstein and the Estate of Sidney Bernstein for fraud, conversion, and civil conspiracy. By twenty-three points of error, Sidney Bernstein and the Estate of Sidney Bernstein [1] appeal. We reverse and render

1. We will refer to Sidney T. Bernstein and the Estate of Sidney T. Bernstein collectively as

judgment for appellant in part and remand for a new trial on the remaining issues.

BACKGROUND

Portland conducted business with the brokerage firm of Legel, Braswell Government Securities during 1977 and 1978. In May 1978, the Federal Home Loan Bank Board notified Portland it wished to discuss Portland's financial position at the end of the month. Days before Portland officials travelled to Little Rock to meet with FHLBB officials, Portland's president gave approximately $1.36 million in Government National Mortgage Association (GNMA) bonds [2] to Legel Braswell for safekeeping in exchange for cash. John W. Roberts, a member of the Legel Braswell board of directors, testified that generally a broker would enter a safekeeping agreement and either simply hold onto the bonds or hold them as collateral for a loan. There was conflicting testimony as to whether Legel Braswell's attorney, Sidney Bernstein, drafted or approved either the written safekeeping agreement or the transaction itself. Unbeknownst to Portland, Legel Braswell then reregistered the bonds into its name and pledged them as collateral for a loan from Blyth, Eastman, Dillon & Co., Inc. to Legel Braswell.

Within a week of the safekeeping transaction and almost simultaneously with the FHLBB meeting, the Texas Savings and Loan Department (the Department) issued an order that Portland stop all speculative securities trading. The Department continued to investigate Portland and eventually placed it under voluntary supervisory control. Portland's president was dismissed.

As part of its investigation, the Department inquired into the status of the GNMA bonds. On September 21, 1978, in response to the Department or Portland's second inquiry, Legel Braswell accountant Dan Jones wrote Department Deputy Commissioner Jim Wright that the GNMA bonds had been reregistered in Legel Braswell's name and were pledged as collateral. A

sheet of notes taken by Bernstein indicates that on that same day he participated in a telephone call during which he discussed the status of the bonds, including the possible illegal nature of the transaction. Portland's accountants and Legel Braswell's accountants met in early October to attempt to sort out the transactions between the entities. Wright directed Portland's attorney, Jim Harris, to schedule a meeting at Legel Braswell's offices in Florida to discuss rescission of all transactions between Portland and the brokerage company.

On November 2, 1978, Harris and Wright met with Bernstein and Legel Braswell's principals. Wright and Harris stressed the seriousness of Legel Braswell's position and pressed for rescission. Wright and/or Harris stated that if Legel Braswell would not agree to rescission, they would resort to legal action such as going to the Texas Attorney General, the Securities Exchange Commission, the Justice Department, or others. Any of these actions would have, at minimum, severely impaired Legel Braswell's ability to trade securities. The Legel Braswell representatives went off by themselves to discuss the matter. When they returned, Bernstein stated that Legel Braswell agreed to rescission. Legel Braswell gave Portland a $100,000 check as a good-faith deposit on the agreement. Harris testified that he understood that Legel Braswell was in a cash pinch, but had the wherewithal to make Portland whole. The parties did not agree to specific terms.

The parties next met on November 9, 1978, in Texas. Though Harris had expected to finalize terms of the agreement, no agreement was reached. Bernstein, however, expressly represented that Legel Braswell would make Portland whole. Bernstein drafted a proposed rescission agreement during or after this meeting. The Department and Harris rejected this proposal.

On November 15, 1978, Bernstein attended a meeting between Legel Braswell offi-

---

"appellant." We will use the name "Bernstein" when discussing actions taken by Sidney Bernstein.

**2.** These certificates, also known as Ginnie Maes, are supported by underlying single family or real estate loans. They are traded in the bond market.

cials and bankruptcy attorneys. Portland contends that Legel Braswell determined to file bankruptcy at this meeting; as we will discuss below, the evidence does not support that argument. On November 20, 1978, Portland proposed another rescission agreement. On November 24, 1978, Bernstein sent a mailgram to Harris (with a copy to Wright) in which Legel Braswell agreed to a pay Portland $1,336,000 (the amount Portland proposed) "disposing of this matter *providing mutual agreement on other terms and conditions* contained in the agreement relating to parties, recitals, payments, schedule, and guarantee" (emphasis and commas added). Bernstein followed the mailgram with a letter, dated December 7, 1978, to Wright proposing yet another rescission agreement with additional collateral. Neither Portland nor Wright responded to this proposal until after Legel Braswell filed bankruptcy. Harris testified that this letter gave him "great concern", "spooked" him, and prompted him to seek authority to sue.

On December 13, 1978, Portland's board of directors gave Harris the authority to file suit against Legel Braswell. Meanwhile, Legel Braswell's principals apparently engaged in transactions which drained corporate assets. Portland did not file suit before Legel Braswell filed for Chapter 11 (reorganization) bankruptcy on January 4, 1979. The bankruptcy was converted to a Chapter 7 (liquidation) bankruptcy.

During the course of discovery in its suit against Legel Braswell, Portland found evidence it felt showed potential liability by Bernstein and his brother, Zayle Bernstein.[3] Portland filed this suit against the brothers in 1982. Sidney Bernstein died in 1985. Though the record on appeal contains suggestions of death, it reveals no formal substitution of parties and no amended petition reflecting his death. In 1990, Zayle Bernstein was granted summary judgment on all claims against him. The suit proceeded against Sidney Bernstein's estate.

The jury found that Bernstein intentionally committed fraud, conversion, and con-

spiracy. The jury found compensatory damages totaling $1,236,000 and exemplary damages of $2,472,000. The jury also found that Portland should have known of Bernstein's participation in the conversion on December 7, 1978. The jury further found that, before November 9, 1978, Portland investigated the original transaction between Portland and Legel Braswell and the financial condition of Legel Braswell. The court granted Portland's motion to ignore the findings on Portland's knowledge and investigation, clearing away potential statute of limitations bars to the entry of judgment against Bernstein. The court entered judgment against the Estate of Sidney T. Bernstein. Bernstein and his estate appealed.

## DISCUSSION

We begin our discussion of the case by examining the validity of the judgment against the estate. We will then discuss the court's instruction, the evidentiary basis for certain findings, and the court's disregard of certain jury findings.

### Validity of Judgment

■ By point of error fifteen, appellant contends that the judgment is void on its face because it purports to hold the estate liable for damages. An estate is not a legal entity and is not a proper party in a lawsuit. *Henson v. Estate of Bruce L. Crow*, 734 S.W.2d 648, 649 (Tex.1987). "A suit seeking to establish the decedent's liability on a claim and subject property of the estate to its payment should ordinarily be instituted against the personal representative or, under appropriate circumstances, against the heirs or beneficiaries." *Price v. Estate of Anderson*, 522 S.W.2d 690, 691 (Tex.1975). If, however, the personal representative of the estate appears and participates in the case, a judgment involving "the estate" may validly bind the representative. *Price*, 522 S.W.2d at 692; *Dueitt v. Dueitt*, 802 S.W.2d 859, 861 (Tex.App.—Houston [1st Dist.] 1991, no writ); *see also Henson*, 734 S.W.2d at 649.

■ The purported personal representative of the estate participated in the case.

**3.** References to "Bernstein" always refer to Sidney Bernstein and never to Zayle Bernstein.

The record indirectly reflects that Portland followed the procedure required when a defendant dies.[4] Court rules provide as follows:

> Where the defendant shall die, upon the suggestion of death being entered of record in open court, or upon petition of the plaintiff, the clerk shall issue a scire facias for the administrator or executor or heir requiring him to appear and defend the suit and upon the return of such service, the suit shall proceed against such administrator or executor or heir.

TEX.R.CIV.P. 152. The suggestion of death was made in open court and supplemented by a record of suggestion of death dated February 21, 1986. The record of suggestion of death states that Zayle Bernstein is the personal representative of the estate of Sidney Bernstein.[5] In September 1986, Zayle Bernstein, by his attorneys, filed a motion for sanctions "individually and as Personal Representative of the Estate of Sidney T. Bernstein, by his attorneys." The motion was signed by one attorney and listed two others. The same party and attorney submitted a supplemental memorandum in support of that motion in October 1986. Though the transcript contains no other motions by anyone acting as the personal representative of the estate, the two listed attorneys later filed motions and amended answers on behalf of Zayle Bernstein and the estate. The judgment states that "Sidney T. Bernstein (actually, the personal representative of the Estate of Sidney T. Bernstein having been properly served by writ of *scire facias*) appeared by and through its attorney of record and announced ready for trial."

We find that the judgment against the personal representative is valid, even though it was incorrectly entered against the estate. Though Portland never amended its pleadings to sue the estate, we find that the motions and the judgment show that the personal representative had notice of and participated sufficiently in the case to make the judgment binding against the representative. We overrule point of error fifteen.

### Fraud

In points of error one through three, appellant argues that the trial court erred in overruling its objections to the court's instruction on fraud, in failing to submit appellant's proposed instruction, and in submitting an erroneous instruction. The court instructed the jury on three different fraudulent acts: failure to disclose information with the intent to induce action, material misrepresentation, and failure to correct a statement that actually was false.[6] Appellant objected to the instruction on the actions for fraud through nondisclosure, contending that there is no duty to disclose absent a fiduciary or confidential relationship between the parties, or reliance on a prior statement of fact that turns out to be incorrect. Appellant also objected to the instruction because it made no distinction based on Bernstein's status as an attorney. Appellant objected to the instruction on material misrepresentation because it included recklessness as an ele-

---

4. Defendants filed a motion to set aside scire facias, complaining that Portland had not followed the notice procedures that apply to all representations made in open court. The trial court denied the motion.

5. In 1990, the defendants filed their own suggestion of death of Sidney Bernstein. This document makes no reference to any representative of the estate.

6. The instruction provided as follows:

 You are instructed that in order to find FRAUD, you must find (1) that a material representation was made; and (2) it was false; and (3) when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; and (4) he made it with the intention that it should be acted upon by the other party; and (5) the other party acted in reliance on it; and (6) the other party suffered injury.

 You are further instructed that one who, having made a representation which when made was true or believed to be true, remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him, is in the same position as if he knew that his statement was false when made. Non-disclosure is also fraudulent when the facts are intentionally not revealed for the purpose of inducing action by another.

 You are further instructed that mere silence does not amount to fraud or a misrepresentation.

ment of the standard of care, even when evaluating unfulfilled promises. Appellant submitted a proposed instruction on promises or representations about the future that eliminated the recklessness standard. The court overruled the objections and declined to submit appellant's proposed instruction.

■ The jury found fraud on the court's proper and unchallenged broad-form jury questions. We cannot determine from the face of the jury's answers which of the three types of fraud the jury found. We will discuss each of the possibilities in turn. When reviewing charge error, we consider the pleadings, the evidence, and the charge in its entirety and reverse if the charge error amounted to such a denial of appellant's rights as was reasonably calculated and probably did cause rendition of an improper judgment. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986); *Winkle Chevy–Olds–Pontiac, Inc. v. Condon,* 830 S.W.2d 740, 747 (Tex.App.—Corpus Christi 1992, writ dism'd by agr.).

*Failure to disclose*

In point of error one, appellant argues that the trial court erred in overruling its objections to the instructions on fraud because the instructions lacked an explanation of the necessity of a confidential relationship and because as a matter of law there was no confidential or special relationship between Bernstein and Portland. Portland notes that the instruction on failure to disclose information given in this case resembles one we "approved" in *Coronado Transmission Co. v. O'Shea,* 703 S.W.2d 731 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). Actually, we merely quoted the instruction given by the trial court. The parties in *Coronado* did not challenge the propriety of the instruction as it related to duty to disclose, so we did not rule on that issue. *See Id.* at 735. The quoted instruction in the *Coronado* case, therefore, does not control our analysis.

■ Silence can be fraudulent when the nonspeaker is under a duty to disclose information. *Spoljaric v. Percival Tours,*

*Inc.,* 708 S.W.2d 432, 435 (Tex.1986); *Chase Com. Corp. v. Datapoint Corp.,* 774 S.W.2d 359, 365–366 (Tex.App.—Dallas 1989, no writ); *Tempo Tamers, Inc. v. Crow–Houston Four, Ltd.,* 715 S.W.2d 658, 669 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). A duty to disclose can arise when the parties have a fiduciary or confidential relationship. *Tempo Tamers,* 715 S.W.2d at 669. We find no indication in the record that Bernstein owed any duty to disclose information to Portland. We find no evidence of such a relationship between Bernstein personally and Portland. The testimony showed that Bernstein's only contact with Portland occurred in the context of these negotiations. Such limited, armslength contact is not the stuff of which fiduciary or confidential relationships are made.

The above-cited cases that outline fraud through silence do not create in lawyers a duty to disclose confidential information about their client to third parties; this absence of duty is emphasized when the lawyer has no fiduciary or confidential relationship with that third party. The state bar rules indicate that the duty runs to the client and to remain silent. We look to these rules as guides, not as binding law. Attorneys are barred from knowingly revealing confidential information about their clients by the Supreme Court of Texas, Rules Governing the State Bar of Texas (SBR), art. X, § 9, Rule 1.05(b) (1992). This rule is tempered by Rule 1.05(c)(7), which states that attorneys *may* reveal confidential information in order to prevent the client from committing a fraudulent act. SBR, art. X, § 9, Rule 1.05(c)(7). Even if the attorneys have confidential information "clearly establishing that a client is likely to commit a ... fraudulent act," they are only required to reveal confidential information if that act is likely to result in death or substantial bodily harm to a person. SBR, art. X, § 9, Rule 1.05(e) (1992); *see also* SBR, art. X, § 9, Rule 1.05, comment 19 (1992). Because the Texas Supreme Court has chosen not to force attorneys to disclose client confidences to avert nonviolent fraud by clients, we decline to do so

as well.[7] Bernstein was under no duty to disclose information about his client Legel Braswell to Portland.

Our holding that Bernstein had no duty in this case does not run afoul of a case on which Portland relies, *Likover v. Sunflower Terrace II Ltd.,* 696 S.W.2d 468 (Tex. App.—Houston [1st Dist.] 1985, no writ). In *Likover,* an attorney counseled his client to wrongfully withhold a signature from a document in order to coerce a third party to pay his client an additional $400,000 to salvage a land deal. *Id.* at 473. The court upheld the trial court's finding that the attorney was liable for conspiracy to defraud. *Id.* at 474. The holding in *Likover* addresses an attorney taking fraudulent action on behalf of a client or advising fraudulent action by a client. The *Likover* case does not control our analysis of fraud through nondisclosure in an attorney-client context where there is no evidence of the existence of a duty.

■ We find that the court erred when it overruled objections to the charge that targeted the court's failure to include an additional instruction limiting the scope of fraud by nondisclosure to situations where there is a duty to disclose; this error caused the court to give an instruction that stated the law incorrectly. We sustain point of error one as it relates to a finding of fraud on the fraud through failure to disclose theory because we find no evidence of any confidential or fiduciary relationship between Bernstein and Portland. The failure to include the instruction on the need for a duty therefore probably led to an improper judgment on this issue. *See* Tex. R.App.P. 81(b)(1); *see also Island Recreational,* 710 S.W.2d at 555. We must examine whether the jury's finding of fraud is supported under material misrepresentation or failure to correct theories before we can determine whether, viewing the case as a whole, this error was harmful.

*Material misrepresentation*

■ Appellant argues under point of error two that it cannot be liable for fraud through misrepresentation because Bernstein was merely a lawyer for the beneficiary of the fraud, citing *Schatz v. Rosenberg,* 943 F.2d 485, 494–95 (4th Cir.1991) (applying Maryland law and federal securities laws). Such is not the law in Texas. The court in *Likover* referred to a century-old holding that no privilege shields a lawyer from liability for fraudulent acts committed on behalf of a client because fraudulent acts are outside the scope of a lawyer's role. *Likover,* 696 S.W.2d at 472 (citing *Poole v. Houston & T.C. Ry.,* 58 Tex. 134 (1882)). The *Poole* court imposed fraud liability on a lawyer who actively participated in a series of transactions to help a client evade a supplier's stoppage of delivery to his client. 58 Tex. at 137. If Bernstein's actions meet the test for fraud through misrepresentation, his role as a lawyer is no shield from liability under Texas precedent. We overrule the second point of error as it relates to material misrepresentation.

■ By point of error three, appellant contends that the court erred in refusing its instruction on fraud and submitting Portland's instruction. Appellant urges that these actions were erroneous because Portland's instruction included a recklessness standard that jurors could apply to representations about the future. We employ an abuse of discretion standard when reviewing a trial court's refusal to submit requested instructions to the jury. *Magro v. Ragsdale Bros., Inc.,* 721 S.W.2d 832, 836 (Tex.1986).

The instruction given in this case provides as an element of fraud that the jury must find that the speaker made a material misrepresentation and that "when the speaker made [the representation], he knew it was false or made it recklessly

---

7. If we found a duty in lawyers to disclose confidential information in this situation, we would place lawyers in the difficult position of choosing either to remain silent and risk fraud liability or to betray client confidences and risk jeopardizing that and other attorney-client relationships. The risk is particularly great because events may show that silence would not have been fraudulent.

 This holding in no way affects any duty by the client to disclose the information.

without any knowledge of its truth and as a positive assertion." Portland correctly notes that this language tracks that given in *Coronado*, 703 S.W.2d at 735. Our analysis of point of error three is not controlled by *Coronado* because in that case we were not asked to and did not rule on the appropriateness of the recklessness portion of the statute.

 The unqualified inclusion of the recklessness portion of the instruction was erroneous in relation to Bernstein's representation that Legel Braswell would make Portland whole. If the representation is a promise of future action, it cannot form the basis of a fraud action unless the promissor lacked contemporaneous intent to perform. *Spoljaric*, 708 S.W.2d at 434; *See also Schindler v. Austwell Farmers Co-op*, 829 S.W.2d 283, 286 (Tex.App.—Corpus Christi 1992), *modified on other grounds and aff'd*, 841 S.W.2d 853 (Tex.1992); *Wolf v. Fernandez*, 733 S.W.2d 695, 697 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.). Mere breakage of the promise or failure to perform does not prove that the representation was fraudulent. *Spoljaric*, 708 S.W.2d at 435; *See also Schindler*, 829 S.W.2d at 286. Portland correctly points out that recklessness is still an appropriate standard for representations that are opinions about the future and are so intertwined with present facts that the whole statement amounts to a representation of fact. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930–31 (Tex.1983). In *Trenholm*, Ratcliff, a land developer, told Trenholm, a homebuilder, that a trailer park near a proposed subdivision had been sold, that the tenants had been given notice to vacate, that the park "should close up sometime in April," and that the park would thereafter be bulldozed. 646 S.W.2d at 929. Trenholm purchased lots and built homes in reliance on these representations. In fact, the park had not been sold and the tenants had not been given notice to vacate. The trailer park remained and depressed the sales price of Trenholm's houses. *Id.* at 930–31. The court held that Ratcliff's representation regarding the eventual elimination of the park was so intertwined with the representations re-

garding the existence of the sale of the park and the notices to tenants that the whole statement amounted to a representation of facts. *Id.* at 931.

 Portland contends under *Trenholm* that the promise that Legel Braswell would make Portland whole was so inextricably intertwined with implications that Legel Braswell had the wherewithal to make Portland whole as to make the promise a representation of fact. *See Trenholm*, 646 S.W.2d at 930–31. Bernstein's representation that Legel Braswell would make Portland whole was less entwined with representations of current facts than were Ratcliff's statements. Portland asserts that Bernstein's representation indicated that Legel Braswell had the wherewithal to make Portland whole, but does not point to any evidence or testimony that he actually said Legel Braswell did. Our review discloses no evidence that Bernstein ever stated that Legel Braswell had the funds *in hand;* the evidence discloses instead the opposite. Harris, Portland's attorney during the negotiations, testified at trial:

A. Right. I knew they didn't have a million three hundred and some thousand dollars that day when we were down in Florida. They told us that.

Q. And you knew they wouldn't have a million three hundred thousand dollars coming in within the next few weeks because they told you they only had five hundred thousand coming, didn't they?

A. That's correct.

Legel Braswell gave Portland a $100,000 check as partial payment. Legel Braswell's proposal on November 9 does not indicate that Legel Braswell had or expected to obtain shortly the full amount Portland desired. Legel Braswell agreed to the $1.336 million figure on November 24, subject to agreement on terms of repayment. In the conditional proposal made on December 7, Legel Braswell again admitted that it did not have sufficient funds in hand, but expected to obtain some funds soon, and offered additional collateral. None of the settlement proposals were inextricably intertwined with representations of present

wealth so as to make them statements of fact instead of promises (and the later promises were conditioned on terms Portland rejected and so were not really promises at all).

The court's refusal to submit the instruction on promises prevented the jury from considering these statements under the proper standard, and probably resulted in an improper judgment.[8] We sustain point of error three.

*Failure to update*

Appellant's point of error one regarding the court's instruction as to nondisclosure applies to the failure to update as well. The court instructed the jury that a person who makes representations commits fraud if he fails to notify the recipient that the representations, though true or believed true when made, were actually false. Appellant contends that the court erred in giving this instruction because Bernstein had no duty to disclose information since he had no fiduciary duty to or confidential relationship with Portland.

▮▮▮▮ As discussed in the section above on fraud through failure to disclose, any duty on an attorney to speak despite silence from the client is countervailed by the rules requiring an attorney to protect the client's confidences. Failure to disclose information can be fraudulent if a party learns that its previous affirmative representations are false. *Tempo Tamers,* 715 S.W.2d at 669; *Susanoil, Inc. v. Continental Oil Co.,* 519 S.W.2d 230, 236 (Tex.Civ. App.—San Antonio 1975, writ ref'd n.r.e.). We find here as well that the balance tips

in favor of allowing the attorney to remain silent.[9] The court's instruction ignored the possibility that Bernstein might have had no duty to correct any representation he made on Legel Braswell's behalf. Applying the given instruction, the jury could have found that Bernstein, after learning that Legel Braswell would seek bankruptcy protection from its creditors, committed fraud when he failed to tell Portland that Legel Braswell would no longer be able to make Portland whole.[10] Because we find that he had no personal duty to update, the court's overruling of appellant's objection probably did lead to an incorrect judgment. We therefore sustain point of error one as to this form of fraud as well. Tex. R.App.P. 81(b)(1).

*Summary of discussion of fraud by Bernstein individually*

We find that any fraud judgment based on Bernstein's individual actions is based on findings reached under erroneous instructions. We hold that the law does not require an attorney to reveal information about a client to a third party when that client is perpetrating a non-violent, purely financial fraud through silence. When an attorney makes misrepresentations on behalf of a client, however, the general standard for fraud applies to the attorney. Making representations on behalf of a client does not, though, create a duty in the attorney to correct those representations should they prove to be false.

Any finding of fraud through non-disclosure (either via silence or not updating)

---

**8.** Late in its discussion of this point of error, Portland indicates that it may consider the safekeeping agreement an alternate basis for a fraudulent misrepresentation claim. Appellee did not argue this theory to the jury at trial. There is some disputed evidence that Bernstein drafted the safekeeping agreement or approved the subsequent exchange of securities for money that began the chain of events underlying these actions. There is, however, no evidence that Bernstein ever intended or agreed to the reregistration of the securities and pledging of the securities as collateral that Portland claims violated the safekeeping agreement. Thus, no evidence supports any jury finding of fraud by Bernstein based on the drafting of the safekeeping agreement.

**9.** It is only the conflict between the general duty to speak out and the specific duty of the attorney to protect client confidences that creates these exceptions to the fraud standards. These exceptions do not extend to the client. For example, if, on behalf of a client, an attorney makes a representation which later proves false, the client still bears the duty to correct the misrepresentation under the fraud standard.

**10.** This argument assumes that a decision to file bankruptcy necessarily means that no creditors will be made whole. This may be common, but *it is not necessarily the exclusive outcome.*

was directly affected by the failure to give an instruction stating that an attorney is not required to disclose client information to third parties unless the attorney has fiduciary or confidential relationships with those third parties. We find no evidence in the record of any fiduciary or confidential relationship between Bernstein and Portland. Any finding of fraud based on a finding of material misrepresentation in Bernstein's statement that Legel Braswell would make Portland whole was directly affected by the failure to give a special instruction regarding promises. We find that the effect of these lapses was probably an improper finding of fraud resulting in the rendition of an improper judgment.

We overrule point of error two because lawyers are not exempt from liability for fraudulent acts the lawyers commit on behalf of their clients. We sustain points of error one and three as to individual fraud by Bernstein.

*Conversion*

By point of error ten, appellant argues that the trial court erred in overruling its motion for judgment notwithstanding the verdict and for new trial because there is no or insufficient evidence to support the jury's findings that Bernstein committed conversion or civil conspiracy to commit conversion. We will now examine whether there was conversion and reserve our analysis on conspiracy until the next section.

■ The court instructed the jury that conversion "is the wrongful exercise of dominion and control over another's property in denial of and inconsistent with his rights." *See Waisath v. Lack's Stores, Inc.,* 474 S.W.2d 444, 446 (Tex.1971). Portland points to no evidence that Bernstein at any time personally exercised any dominion or control over Portland's bonds, and our review of the record discloses none. As mentioned above, there was disputed testimony that Bernstein prepared the safekeeping agreement under which Legel Braswell took possession of the bonds. Even if Bernstein did prepare the agreement, this preparation is no evidence of conversion by Bernstein since Legel Braswell, not Bernstein, took possession of the bonds. After taking the bonds for safekeeping, Legel Braswell proceeded to register the bonds in its name and pledge them as collateral for a loan from Blyth. Still, there is no evidence that Bernstein himself ever personally exercised any control over the bonds. Bernstein was paid hourly, and there is no evidence that he participated in any gains from the conversion.

To the extent that point of error ten addresses the finding of conversion by Bernstein, we sustain the point of error.

*Conspiracy*

The jury responded affirmatively to the court's broad-form question of whether they found conspiracy. It is not clear whether the jury found conspiracy to commit conversion or to commit one or more of the fraud variations. We must, therefore, analyze each of the possibilities.

Some of appellant's points of error that attack the findings and instructions on fraud or conversion also serve to attack the finding of conspiracy to commit fraud or conversion. This dual-purpose attack is possible because a civil conspiracy requires "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983).

■ The plaintiff in a conspiracy action must prove (1) two or more persons, (2) an object to be accomplished, (3) a meeting of minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as the proximate result. *Id.* Once a civil conspiracy is proven, each conspirator is responsible for the acts done by any other conspirator to further the conspiracy. *Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 926 (Tex.1979); *Likover,* 696 S.W.2d at 474. Because of the secretive nature of conspiracies, courts allow plaintiffs to show conspiracy by circumstantial rather than direct evidence. *Kirby v. Cruce,* 688 S.W.2d 161, 164 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). The agreement need not be formal, the understanding may be tacit, and each conspirator need not know the details of the conspira-

cy. *Id.* at 164; *Bourland v. State of Texas,* 528 S.W.2d 350, 354 (Tex.Civ.App.— Austin 1975, writ ref'd n.r.e.). Vital facts may not, however, be proved by unreasonable inferences or by piling inference upon inference. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 858 (Tex.1968). Persons without knowledge of the object or purpose of the conspiracy cannot be coconspirators because they cannot agree to the commission of wrongs about which they know nothing. *Id.*

*Conspiracy to commit fraud*

 An attorney can be liable for conspiracy to defraud if he knowingly agrees to defraud a third person. *Likover* 696 S.W.2d at 472. Evidence of an attorney's knowledge of the fraudulent nature of his and others' actions and intent to share in the fruits of that fraud can defeat a claim that the attorney was ignorant of fraud and acting solely at the clients' direction and can expose the attorney to liability for conspiracy to defraud. *Kirby,* 688 S.W.2d at 164; *Bourland,* 528 S.W.2d at 355. Mere knowledge and silence are not enough to prove conspiracy, however; because of the attorney's duty to preserve client confidences, there must be indications that the attorney agreed to the fraud.

 In point of error nine, appellant contends that there is no or insufficient evidence to support a jury finding that Bernstein conspired to commit fraud. This point applies to all three theories of fraud. When reviewing a "no evidence" point of error, we consider only evidence and inferences that tend to support the finding, and disregard all evidence and inferences to the contrary. If there is any evidence of probative force to support the finding, the "no evidence" point must be overruled and the finding upheld. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.,* 774 S.W.2d 666, 668 (Tex.1989). When considering a point of error challenging the sufficiency of the evidence, we follow the well-established tests in *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex. 1989), *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986) and *Dyson v. Olin Corp.,* 692 S.W.2d 456, 458 (Tex.1985). We will consider and weigh all of the evidence in the case and set aside the judgment and remand for a new trial only if we conclude that the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool,* 715 S.W.2d at 635.

 It is the prerogative of the fact finder, in this case the jury, to resolve any contradictions or inconsistencies in the evidence and to judge the credibility of the witnesses and the weight to be given their testimony. *Blanco v. Garcia,* 767 S.W.2d 896, 897 (Tex.App.—Corpus Christi 1989, no writ). The fact finder can make reasonable inferences and deductions from direct or circumstantial evidence. *Id.*

 We find insufficient evidence to support a finding that Bernstein conspired to commit fraud. In his testimony, Harris essentially laid out Portland's theory of Bernstein's involvement in addition to the representations. Harris began with the safekeeping agreement and its entry just before state and federal agencies brought heightened scrutiny to bear on Portland. He stated that the trade was unusual, and the reregistration even more unusual. He said that Jones said that Bernstein wrote out the language for the safekeeping agreement. He noted that Jones stated that the safekeeping agreement was "the only thing that made Legel Braswell profitable that year." Harris pointed to Legel Braswell's reluctant response to the inquiries (confirmations) regarding the bonds— failure to respond to the first one and lack of complete forthrightness in response to the second—as further suspect. He stated that Bernstein's notes of September 21 show "he was intimately involved in the creation of the—in the preparation of the confirmation letter" from Jones, also dated September 21. He stressed that the use of the words "adjusted trade" in his notes as evidence of Bernstein's culpability. Harris next pointed to Bernstein's familiarity with Legel Braswell's offices and personnel (a staff of 60 or so employees) as an indica-

tion of his familiarity with the operation. Harris said he was impressed by Bernstein's past as a lawyer for the SEC, his acknowledgment of problems with the trade, and his role as spokesman at the November 9 meeting.

Portland essentially argues that circumstances combined with Bernstein's participation in the drafting of the safekeeping agreement, the confirmation letter, the negotiations, the meeting with bankruptcy attorneys, and the continuing negotiations are sufficient to support the jury's finding that Bernstein was part of a conspiracy. We disagree.

The evidence regarding Bernstein's involvement in the preparation of the safekeeping agreement is insufficient to show his involvement in a conspiracy to defraud. Harris's information regarding Bernstein's preparation was second-hand and later undercut by its sources. Jones told Harris that Larry Legel had told Jones that Bernstein had approved the wording of the agreements and the trade itself. Jones testified that Larry Legel later told him that Bernstein did not approve the wording, that Legel and Mary Ann Gibson had come up with the wording, and that Legel had said that Bernstein approved the wording to cover himself (Legel). Legel also said he was not sure if Bernstein had approved the trade or had even been consulted. At that time Legel also told Jones that he would not say anything in his deposition to hurt Bernstein. Legel's deposition corroborated Jones's detailing of Legel's altered view of Bernstein's involvement.

Other persons from Legel Braswell cast doubt on the assertion that Bernstein participated in the drafting of the safekeeping agreement. Lawrence McGowan, Legel Braswell's corporate secretary, said he had no reason to believe that Bernstein participated. Though McGowan admitted he did not spend time on the trading floor, he did not remember Bernstein being involved in producing the safekeeping confirmation that came from the computer room where McGowan worked. He testified that traders would not consult Bernstein for normal or unusual trades. Allen Legel testified

that he had no knowledge or information that Bernstein participated in the original trade. He testified that neither Bernstein nor any attorney participated in Legel Braswell's trading activities. Roberts, a member of the board of directors, testified that he had no basis for believing that Bernstein helped prepare the safekeeping documentation, though he admitted he had no real day-to-day knowledge of the firm since his only role was as a director. He stated that such documents were prepared instantaneously in the normal course of business and that he knew of no reason Bernstein would have been involved. Robert Bush, an employee, testified that, though his first involvement with Portland was in the fall of 1978, he saw nothing in the Portland account to indicate any involvement by Bernstein. Bush said he did not believe that Bernstein was involved in the safekeeping transaction because he never saw any legal counsel involved with Portland transactions.

Even if Bernstein did approve the language of the safekeeping agreement, there is no evidence that he agreed to any malfeasance. Former deputy commissioner Wright stated that the nature of the transaction was not illegal, though the magnitude was too great for Portland's resources. As discussed above, there is no evidence that Bernstein knew of or agreed to the reregistration of the bonds into Legel Braswell's name.

Bernstein's September 21 notes and Jones's confirmation letter are, at most, minimal circumstantial evidence of involvement in any conspiracy. Standing alone, they would unquestionably be insufficient. There is no direct link between these two documents other than the dates. Bernstein's notes contain many of the key words and players in the case—GNMA, safekeeping, adjusted trade, Blyth, Jones, and Larry Legel—but there is no evidence of his approval of or agreement to nefarious schemes in either document.

Bernstein's familiarity with Legel Braswell's offices and its personnel is no evidence that he agreed to any wrongdoing either. As Harris said on recross examina-

tion, his (Harris's) role as lawyer for Portland and familiarity with its personnel did not mean that he knew of the misdealings of its president or its financial predicament. Harris stated that the totality of the circumstances, including Bernstein's familiarity with the office on November 2,[11] indicated that Bernstein was aware of what was going on regarding the safekeeping transaction. Awareness is not the basis of conspiracy, however; some kind of agreement is required. Harris did not testify that Bernstein agreed to the transaction nor that he agreed to the reregistration.

Bernstein testified that he did not know what Legel Braswell's financial position was until after the negotiation period. Roberts testified that in September 1978, the firm's accountants painted a glowing picture of the firm's financial year. The glow in that picture was apparently due largely to the Portland transactions. Bernstein testified that he remembered being hired in late October 1978 for the negotiation process with Portland, though he stated that his records showed some preliminary work of less than two hours regarding Portland as early as August 1978. Allen Legel testified that Bernstein had no knowledge of Legel Braswell's financial condition independent of what Allen Legel had told him. Legel told Bernstein that Legel Braswell did not have $1.3 million on hand. Bernstein testified that Legel Braswell officials told him that a forced immediate payment of $1.3 million would bankrupt the company, and Bernstein said he passed this statement on to Harris. He categorically denied that he knew that Legel Braswell could not meet the obligations contained in his settlement offers, even those made after he attended the November 15 meeting with bankruptcy attorneys. Bernstein testified that the November 15 meeting ended with a decision that Legel Braswell did not need to file bankruptcy. He testified that he was not asked to and did not review Legel Braswell's financial situation until January 1979, when he advocated

seeking the protection of the bankruptcy court.

Portland relied on some rather vague testimony from Jones to postulate that Legel Braswell determined to file bankruptcy in November, that Bernstein knew it, and that both kept the decision a secret. Jones stated

A. I don't think the meetings leading to the decision to file bankruptcy, I don't recollect Sidney being there. I do think Sidney attended the original meeting prior to bankruptcy down at the offices of the attorneys that filed the bankruptcy for us. I think he was present then.

Q. Prior to the filing of the bankruptcy?

A. Right, prior to the filing.

Q. That's the only meeting that you were at?

A. That's the only one that I recollect.

Q. Do you recall who was present at that meeting?

A. All the principals and the executive committee, myself. Harry Braswell had flown down from New York. He was there. I think that was it.

Q. What was discussed at that meeting?

A. Well, it was a general discussion that, you know, with the attorneys that were going to handle the bankruptcy, that the decision had been made to consult them about what they thought. And they came up with a quick decision that, yes, we should file bankruptcy. I was instructed as to what would be required for me to get up the petition for filing.

This testimony does not contradict Bernstein's testimony. Jones gives no dates for the meeting, but his testimony is that both he and Bernstein attended the meeting at which Legel Braswell decided to file bankruptcy. A comparison of Bernstein's time sheets with Jones's testimony indicates that the November 15 meeting was not the meeting at which Legel Braswell decided to file bankruptcy. Bernstein's record of the November conference lists Allen Legel,

---

11. Testimony and time records showed that Bernstein was involved enough with Legel Braswell to have gained familiarity with its people and layout. He was engaged at different times for a variety of different purposes.

Roberts, McGowan, and the bankruptcy lawyers as attending. Absent from this list but present on Jones's roster of the decisive meeting are Braswell and Jones himself. Bernstein's testimony explicitly mentions Braswell as arguing against bankruptcy at the January meeting at which Legel Braswell decided to file bankruptcy Jones's testimony indicates that there were meetings on bankruptcy between November and January, and other witnesses testified that principals looted the firm. There is no evidence that Bernstein attended or knew of these meetings or the raids. There is no evidence that Legel Braswell decided to file bankruptcy in November 1978 or that Bernstein agreed to keep any such decision a secret.

Bernstein's persistence in making settlement proposals on behalf of Legel Braswell after the bankruptcy meeting is not sufficient to support a jury finding that he was involved in a conspiracy to defraud. Portland argues that his offers were hollow promises, relying on this testimony by Allen Legel:

> I think what it boiled down to is that we were not able to make an agreement yet. I wanted to keep things open, so I sent a letter saying that I could agree to the number and they wanted to agree to a whole lot more.

This does not support a finding that Bernstein's later offers were false or fraudulent. All of the representations following the representation that Legel Braswell would make Portland whole were conditional on Portland agreeing to the terms of repayment. As discussed above, Bernstein stated and Harris understood that Legel Braswell did not have the cash on hand. Legel, in "keeping things open," was trying to stave off demand for immediate payment which he testified that he knew and Bernstein knew (and testified he told Harris) would force Legel Braswell into bankruptcy.

Against this background, we will discuss individual allegations of conspiratorial bad acts.

■ *Failure to disclose.* The conspiracy findings must be viewed in the proper legal framework. That framework should include a threshold question of whether Bernstein and his alleged conspirators owed a duty to disclose to Portland. Appellant assails the instruction given on fraud through nondisclosure because it did not allow for the possibility that there was no duty to disclose. Our discussion of this issue with regard to the non-conspiracy counts is relevant to the conspiracy issues because conspiracy requires proof of bad acts. A flaw in the instruction on the unlawful predicate act (fraud) can thus undermine any finding of conspiracy based on fraud.[12]

The court's instruction did not allow the jury to consider whether any relationship giving rise to a duty to disclose existed between the alleged conspirators and Portland. *See Tempo Tamers*, 715 S.W.2d at 669. With respect to Bernstein individually, this was, as discussed above, an incorrect statement of the law. Because the alleged conspirators were brokers, however, they had a fiduciary relationship with Portland at one time. *First City Mortgage Co. v. Gillis*, 694 S.W.2d 144, 146 (Tex. App.—Houston [14th Dist.] 1985). There likely was nevertheless no duty at the time of the alleged fraud because Portland effectively terminated the broker-client relationship by demanding rescission of all transactions. Portland did not show and we found no real indication in the record that any other fiduciary or confidential relationship existed between Portland and any conspiracy involving Bernstein. The erroneous instruction probably caused the jury to make an incorrect finding resulting in rendition of an improper judgment.

We therefore find that the overruling of appellant's objections to the charge on the definition of fraud based on non-disclosure

---

**12.** Failure to find fraud by an individual, however, does not automatically bar a finding of conspiracy to commit fraud by that individual. A person may know of and agree to and support a plan to commit fraud without committing fraudulent acts. That person can be liable for conspiracy.

was reversible error as to the conspiracy to commit fraud through nondisclosure claim.

We also find that, even if there were a duty, there is insufficient evidence to support a finding of conspiracy to defraud involving Bernstein. There is no direct evidence that Bernstein agreed to wrongfully withhold information from Portland intending to induce detrimental reliance. The evidence in the record indicates that he did not know of Legel Braswell's financial state or any intent to file bankruptcy during the negotiations, and thus could not have agreed to withhold this information. The evidence is insufficient to support a finding that Bernstein was part of a conspiracy to defraud through nondisclosure.

 *Fraud through misrepresentation.* We discussed all of the various misrepresentations by Legel Braswell of which Portland complains when we discussed above the misrepresentations by Bernstein. The flaw in the instruction that undermines a finding of fraud through misrepresentation—failure to set out the correct standard for promises—likewise undermines a finding of conspiracy to commit fraud through misrepresentation. Since the evidence indicates that representations by Bernstein and his alleged conspirators were promises not inextricably entwined with representations of current facts, this incorrect instruction is reversible error because it probably caused the rendition of an improper judgment.

 *Fraud through failure to update.* As we discussed with regard to conspiracy to defraud through nondisclosure, the conspiracy allegations must be viewed in the context of duty. The court gave an instruction that did not allow for the possibility that the conspirators had no duty to update representations. Though the rescission demand likely ended any fiduciary duty from the broker-client relationship, a duty to update arises if the speaker learns that an earlier representation is false. *Tempo Tamers,* 715 S.W.2d at 669; *Susanoil,* 519 S.W.2d at 236. Above, we found that Bernstein's role as a lawyer largely excepted him from any duty to update as to representations made on behalf of a client, but that Legel Braswell might still have the duty to update. Thus, if Bernstein agreed with Legel Braswell personnel not to update once they learned that a promise was false when made, he could be liable for conspiracy to defraud. We find that there is insufficient evidence to support a jury finding of conspiracy to defraud on this theory.

There is insufficient evidence to support a finding that Bernstein conspired to remain silent about a discovery that Legel Braswell would be unable to make good on its original promise. There is no direct evidence that Bernstein knew that the representation was false. Testimony indicated that Bernstein attended the November meeting at which Legel Braswell discussed filing bankruptcy, but there is no evidence that he knew of any decision not to make Portland whole.[13] Instead, Bernstein denied that the meeting gave him the impression that Legel Braswell would not be able to make Portland whole. The only evidence is that Bernstein, under instructions from Legel Braswell, continued to attempt to reach an agreement on a payment plan.[14] Testimony also indicated that principals of Legel Braswell proceeded to drain the company of its assets, but there is no evidence

---

**13.** Even if we accept Portland's argument that Legel Braswell decided to file bankruptcy at this meeting, there is no evidence of such knowledge.

**14.** We note, purely as an aside, that we are surprised to find no reference in the briefs—and little reference in the record—regarding the effect of the bankruptcy code provisions on Portland's recovery. We wonder how, considering the realities of litigation and the provisions of the predecessors to the current bankruptcy code (e.g. the stay of litigation under 11 U.S.C. § 29(a) (revised and recodified at 11 U.S.C. § 362) and the avoidance of preferences, including judgment liens, under 11 U.S.C. § 107 (revised and recodified at 11 U.S.C. § 547)), any delay in filing suit after November 2, 1978, actually reduced Portland's recovery from Legel Braswell in light of the bankruptcy filing in January 1979. If Portland's recovery was not reduced, then the detriment of Portland's reliance—and thus Portland's fraud recovery—is less certain.

that Bernstein knew of or agreed to remain silent about these activities.

There is also insufficient evidence to support a finding of conspiracy to defraud through failure to update to the extent that Portland's claim is based on any of the proposals made after the bankruptcy decision. Those proposals promised rescission conditioned on agreement on terms of repayment. There is no evidence that 1) Bernstein learned that these conditional representations were false and agreed not to tell Portland, or 2) Portland relied on any failure to amend these conditional representations to its detriment. The only evidence is that Bernstein testified that he believed Legel Braswell could meet the proposed obligations, and that Portland rejected these proposals and decided to file suit.[15] The evidence in the record indicates that Bernstein did not know of any reason that his earlier representations were false or needed amending, therefore he could not have conspired to defraud by not amending them.

We find insufficient evidence to support a jury finding that Bernstein conspired to defraud Portland by agreeing not to amend any affirmative representation that he later learned was false. We therefore sustain point of error nine as to this issue.

### Conversion

In points of error ten and fourteen, appellant contends that the court erred in overruling its motion for judgment notwithstanding the verdict and for new trial because there is no or insufficient evidence to support the jury's finding that Bernstein committed civil conspiracy to commit conversion. Point of error thirteen makes the same argument with respect to any finding of conspiracy by Bernstein with Legel Braswell.

As discussed above, conversion is the wrongful exercise of dominion and control over another's property in denial of and inconsistent with his rights. *See Waisath*, 474 S.W.2d at 446. When the rightful owner consents to the dominion and control

by another, the action does not deny and is not inconsistent with the owner's rights; thus, there is no conversion. Portland points to Bernstein's supposed preparation and/or approval of the safekeeping agreement and transaction to support its claim that Bernstein was engaged in a conspiracy to convert the bonds. This does not support a finding of conspiracy to convert by Bernstein. Even if he prepared or approved the safekeeping agreement and/or exchange of the bonds for cash, he merely facilitated an exchange to which Portland, through its president, agreed, negating conversion. We find no evidence that Bernstein knew of or agreed to the acts that form the basis of the conversion claim, i.e. the reregistration and pledging of the bonds as collateral that was beyond the scope of the agreement and inconsistent with Portland's rights. We find that there is no evidence to support a jury finding of conspiracy by Bernstein to commit conversion.

To the extent that points of error ten, thirteen, and fourteen address the finding of conspiracy to commit conversion by Bernstein, we sustain the points of error.

### Disregarded findings

Appellant contends by four points of error that the trial court erred in disregarding certain of the jury's findings. We disagree.

Appellant complains by points of error eleven and twelve that the trial court erred in granting Portland's motion for judgment notwithstanding the verdict, disregarding the jury's finding number six, and denying entry of judgment for Bernstein on that finding. Question six provided as follows:

If, in answer to Question No. 2, you have found that Sidney Bernstein participated in any way in the conversion of any property of Portland Savings and Loan Association, then find the date which Portland Savings and Loan Association knew or, in the exercise of reasonable

---

**15.** Portland's rejection seriously undermines any argument of reliance on the representations in these proposals.

care, should have known of his participation.

ANSWER: (Date): Dec. 7, 1978

The trial court granted the motion to disregard this answer and rendered a judgment notwithstanding the verdict. The court cited the correct bases for disregarding the findings—immateriality and lack of evidentiary support. *See Eubanks v. Winn*, 420 S.W.2d 698, 701 (Tex.1967); *See also Transamerica Ins. Co. v. Hernandez*, 769 S.W.2d 608, 611 (Tex.App.—Corpus Christi 1989, writ denied). The trial court correctly disregarded the answer to question six because there is no evidence to support it.

Because we have found that there is no evidence to support the findings of conversion or conspiracy to convert by Bernstein, we find that there logically can be no evidence to support a finding of any date on which Portland knew or should have known of that unproven participation. We will nevertheless also address the argument put forth by appellant on this issue. We will apply the standard of review for "no evidence" points set out above.

Appellant contends that the evidence shows that Portland was aware of the location, transfer, and control over the bonds before December 7, 1978. Appellant cites much evidence to support that proposition. Question six, however, deals with Portland's knowledge of *Bernstein's* activities, not just Legel Braswell's activities or the general state of the bonds. The evidence appellant adduced provides no evidence of Portland's knowledge, actual or imputed, of Bernstein's activities.

Appellant argues in its reply brief that Portland knew or should have known of Bernstein's participation in the conversion because Harris, Portland's lawyer, testified that Bernstein had no credibility after running out on the November 9, 1978, meeting. Appellant also cites as support Harris's testimony that Bernstein's letter of December 7, 1978, gave him great concern, spooked him, and prompted him to seek authority to sue. Harris's belief that Bernstein lacked credibility and wrote unsettling letters is no evidence that Portland knew or should have known that Bernstein

had committed a particular bad act, i.e. participation in conversion. We overrule points of error 11 and 12.

By points of error five and six, appellant argues that the trial court erred in granting Portland's motion for judgment notwithstanding the verdict, disregarding the jury's answers to question seven, and denying entry of judgment for Bernstein based on the jury's answers to question seven. Question seven provided as follows:

Do you find from a preponderance of the evidence that on or before November 9, 1978, Portland Savings and Loan Association made an investigation of the following:

A. The original transaction between Portland Savings and Loan Association and Legal, (sic) Braswell?

... ANSWER: Yes

B. The financial condition of Legel, Braswell?

... ANSWER: Yes

The trial court rendered judgment notwithstanding these findings, stating that there was no evidence to support the findings and that the questions were immaterial. Bernstein moved for a new trial, asserting that the disregarding of these findings was error. The trial court denied the motion. We find that the court correctly disregarded the questions as immaterial.

The questions are immaterial because they do not negate Portland's reliance on Bernstein's representations. Appellant contends that the affirmative answers on investigation mean that Portland could not, as a matter of law, have relied on any representation by Bernstein. *See Chitsey v. National Lloyd's Ins. Co.*, 698 S.W.2d 766, 769 (Tex.App.—Austin 1985), *aff'd on other grounds*, 738 S.W.2d 641 (Tex.1987); *Laughlin v. Federal Deposit Ins. Corp.*, 657 S.W.2d 477, 483 (Tex. App.—Tyler 1983, no writ). These cases rely on *Kolb v. Texas Employers' Ins. Ass'n*, 585 S.W.2d 870, 872 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.), a case which did not state the proposition nearly so strongly. The Texarkana court has rejected the *Chitsey* and *Laughlin* interpretation of *Kolb* as too broad. *Lutheran*

*Bhd. v. Kidder Peabody & Co., Inc.*, 829 S.W.2d 300, 308 (Tex.App.—Texarkana 1992, writ dism'd). The Texarkana court held in *Lutheran Brotherhood* that reliance is the key. *Id.* Litigants cannot recover for fraudulent representations when they rely solely on their own investigation, but can still recover if they rely on another's representations in addition to their own investigation. *Id.* The trial court in this case, relying on an implied jury finding of reliance on the representations, could have thus found that the jury found reliance and that the investigations were immaterial. We believe the evidence exists to support such a decision. We overrule points of error five and six.

## CONCLUSION

We find that the trial court erred in overruling objections and rejecting alternatives to its fraud instruction. As specified above, we sustain all or part of points of error one, three, nine, ten, thirteen, and fourteen. Because sustaining these points of error undermines the entire judgment, we do not address the remaining points of error on issues such as evidentiary rulings and damage awards. Because we found that Bernstein himself had no duty to disclose information about his client Legel Braswell and no duty to update misrepresentations made on behalf of Legel Braswell, we render judgment for appellant on these issues regarding Bernstein's acts as an individual. Because we found no evidence to support a finding of conversion or conspiracy to convert by Bernstein, we render judgment for appellant on that issue. We reverse and remand for a new trial on the remaining issues.

Concurring opinion by BONNER DORSEY, J.

DORSEY, Justice, concurring.

I concur in the judgment of the court, however, I disagree with the analysis and disposition of appellant's third point of error. The court holds that the trial court erred by instructing the jury that fraud could be based on a false statement that was made "recklessly without any knowl-

edge of its truth and as a positive assertion." I believe a reckless assertion may indeed constitute a basis for fraud if the other elements are present.

The essence of actual fraud is a deception with the intent to deceive and induce reliance. *Blue Bell v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408, 415 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). It is the intentional breach of one's duty to another to speak the truth, designed to injure or procure some wrongful advantage. *Chien v. Chen*, 759 S.W.2d 484, 494–95 (Tex.App.—Austin 1988, no writ). The Dallas Court in *Blue Bell* explained that the intent element in a fraud action requires a great degree of purposeful conduct; that is, merely because it "should be known" to the speaker that another will rely on his representation is not enough. *Blue Bell*, 715 S.W.2d at 415.

The intent to deceive must exist at the time the false statement relied on is made. *See Atlantic Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 419 (Tex.App.—Houston [14th Dist.] 1991, denied); *Blue Bell*, 715 S.W.2d at 415. Intent is always difficult to prove, and its proof is usually from the surrounding circumstances, as one charged with fraud rarely admits the false statement was uttered intending to deceive the other. *See generally Custom Leasing, Inc. v. Texas Bank & Trust Co. of Dallas*, 516 S.W.2d 138, 144 (Tex.1974); *Alamo Sav. Ass'n of Texas v. Forward Constr. Corp.*, 746 S.W.2d 897, 899–900 (Tex. App.—Corpus Christi 1988, writ dism'd w.o.j.) (fraud in the transaction); *O'Shea v. Coronado Transmission Co.*, 656 S.W.2d 557, 562 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.), *appeal after remand*, 703 S.W.2d 731 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.).

Intent to deceive by the utterance of a false statement may certainly be shown by evidence that the speaker knew the statement was false at the time. *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 727 (Tex.1982); *Johnson v. Smith*, 697 S.W.2d 625, 633 (Tex.App.—Houston [14th Dist.] 1985, no writ). However, ignorance of the truth or falsity of the statement as well as

the reckless assertion of it as truth may also support a conclusion the statement was made with the intention that the other act on it to his detriment. *Custom Leasing*, 516 S.W.2d at 144 (quoting *Wilson v. Jones*, 45 S.W.2d 572, 575 (Tex.Comm.App. 1932)). The Court in *Wilson* stated, "[W]here affirmative representations of fact are made and *designed to be acted upon by another* and he does so believing them to be true when they are false, one making the representations is liable, regardless of his knowledge of falsity or intent to deceive." *Wilson*, 45 S.W.2d at 575 (emphasis added); *see* 37 C.J.S. *Fraud* § 21 (1943). The majority holds that in order for a promise of a future action to constitute a fraudulent representation, the promissor must lack the intent to perform. In this case, the promissor, Bernstein, is not the party who will allegedly perform in the future. Rather, the representation made here was a promise by Bernstein that another entity, Legel Braswell, would perform some future act, not that Bernstein himself would do so.

One can never know with absolute certainty whether another will perform; one cannot promise the future actions of another. As such, the requisite element of the promissor's intent to perform is not applicable to situations like this one. Therefore, we apply the standard law of frauds to this case. All that is required is an assertion of fact made recklessly or with knowledge of its falsity with the intent that the other party will rely. Bernstein could not know whether Legel and Braswell would make Portland whole, yet Bernstein made that representation to Portland with the intent to deceive and induce action.

I would overrule point of error three. Otherwise I concur in the judgment of the court.