Sanford **LIKOVER**, Appellant,

v.

**SUNFLOWER TERRACE II,
LTD.**, Appellee.

No. 01–84–0765–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 22, 1985.

Barry G. Flynn, Barry G. Flynn & Associates, Houston, for appellant.

Julius Glickman, Glickman & Barnett, Houston, for appellee.

Before COLEMAN, C.J. (Retired), and JACK SMITH and COHEN, JJ.

## OPINION

COLEMAN, Chief Justice (Retired).

Sunflower Terrace, Ltd., and its successor, Sunflower Terrace II, Ltd., (Sunflower), brought suit against Erwin A. Ritter; his wife, Monique Ritter; his son, Ron Ritter; Capital Title Company; and Ritter's lawyer, Sanford Likover. After a trial to a jury, the trial court rendered a judgment in favor of the plaintiffs against all defendants for damages. Likover has appealed. The principal issue is whether an attorney-at-law acting for a client in settlement negotiations can be held liable for damages as a co-conspirator. The judgment is affirmed.

On September 30, 1983, Sunflower through its general partners, Robert Kendrick (Kendrick) and Jackson Ryan (Ryan), purchased the 160-unit Sunflower Terrace Apartments. The property was purchased from Erwin A. Ritter, Monique Ritter, Matthew W. Noall, and his wife, Marcile Noall. The Noalls were not active participants in the transactions resulting in this suit. Erwin Ritter acted for them through a power of attorney. Early in 1983, the Ritters and the Noalls submitted the successful bid for the purchase of an apartment complex, The Sunflower Terrace Apartments, located in Houston, Texas, from the U.S. Department of Housing and Urban Development (HUD). Because Ritter did not have the financial resources to close on the purchase of the project from HUD, he spent approximately three months trying to acquire additional financing or investors for the purchase. A third party put Jackson Ryan, from Corpus Christi, Texas, in touch with Ritter.

On September 30, 1983, Jackson Ryan, his attorney, Robert Kendrick, and Jackson Ryan, Jr., travelled to Houston to meet Ritter and to investigate the potential investment. September 30, 1983, was the end of the fiscal year for HUD, and the purchase of the project had to be completed on that day or the bid would be forfeited.

After several meetings between Ryan, Kendrick, Ritter, and others, it was agreed that Ryan and Kendrick would form a partnership that would acquire ownership of the subject apartments.

At the closing, since HUD still had title in its name, two deeds were prepared. The first deed was a special warranty deed from HUD to the Ritters and the Noalls. The Ritters and the Noalls then executed a general warranty deed conveying the property to Sunflower Terrace, Ltd. Shortly thereafter, Capital Title Company, which had issued a title policy in connection with the transaction, became concerned, because it believed there was a technical gap in the chain of title. A deed of trust to Allied Mercantile Bank showed title from HUD to Erwin Ritter, Monique Ritter, and Jackson Ryan. Capital Title was concerned because Ryan's name did not appear in the chain of title to Sunflower. It was agreed that Sunflower Terrace, Ltd., would convey the property to Erwin Ritter, Monique Ritter and Ryan and simultaneously Erwin Ritter, Monique Ritter, and Ryan would reconvey the property to Sunflower Terrace, Ltd. Kendrick signed the deed on behalf of Sunflower Terrace and obtained Jackson Ryan's signature on the deed from Erwin

Ritter, Monique Ritter, and Ryan to Sunflower Terrace, Ltd.

By letter, Kendrick sent both deeds to Jeannette Ubernoski of Capital Title Company. The letter expressly instructed her not to file the deed to Erwin Ritter, Monique Ritter, and Ryan until she would simultaneously file the deed back to the partnership. When Jeannette Ubernoski received both deeds, she called the Ritters to come in and sign the deed back to Sunflower. Erwin Ritter said that his wife was out of town but told Ms. Ubernoski to mail the deed to him. On that same day, Ritter went to see Sanford Likover, who had previously represented him, and discussed the matter. Thereafter, Ritter told Ms. Ubernoski that he would sign the deed, but he did not do so. Further, at the suggestion of Erwin Ritter, Ms. Ubernoski filed the deed, which act was contrary to Ryan's instructions.

Prior to the purchase of the property, Sunflower acting through Kendrick and Ryan, and Erwin Ritter acting for himself, his wife, Monique Ritter, and the Noalls entered into a written agreement, whereby Sunflower agreed to purchase the apartment project for a cash consideration of $79,793. In addition, Sunflower agreed to reimburse Ritter the sum of $36,738 in cash for penalties paid by Ritter to HUD in connection with the project. The writing contained these further provisions:

> Sunflower shall pay in cash to Ritter & Associates, architects, the sum of One Hundred Ten Thousand, Two Hundred Seven Dollars ($110,207.00) cash as payment for architectural services and blueprints and plans prepared by such architects in connection with rehabilitation of the above project.
>
> Sunflower shall pay to Realty [entirely controlled by the Ritters] the sum of Sixty Thousand Dollars ($60,000.00) in return for the agreement of Realty to act as a management supervisor for the operation of the project for a period of six months beginning October 1, 1983.
>
> Sunflower agrees to enter into a construction contract with Ritter for construction of the HUD required rehabilitation for a turnkey price of One Million Dollars ($1,000,000.00), such construction to be completed within six months from the date of such contract.

This contract was executed on September 30, 1983. The cash considerations required were paid to Ritter by Sunflower Terrace, Ltd.

Subsequently, it developed that no plans or blueprints had been prepared by Ritter & Associates, as represented. Ron Ritter, the son of Erwin Ritter, was a partner with others in Ritter & Associates. It developed that neither Ron Ritter nor any of his associates were licensed architects, although they had graduated from college with degrees in architecture.

No contract for the rehabilitation was ever executed. Kendrick testified that it had been agreed that a standard American Institute of Architects contract had been agreed upon and that he had prepared such a contract. When he took it to Houston, he intended to get the plans and specifications from Ritter and attach them to the contract. Ritter told him that the plans and specifications were not ready at that time, but that he would send them to him. They consisted of three little sheets that were drawings of the floorplan and were entirely insufficient for the purpose. He then had his architect get in touch with Ron Ritter.

Mr. Boggs, a member of an architectural firm in Corpus Christi, testified that he reviewed the three sheets received from Ritter and told him that they were entirely insufficient for such a project. At Kendrick's suggestion, he called Ron Ritter and asked him when they would have something more. He was told that Ron Ritter had not been authorized to proceed with the work until after the building contract was signed and closed. The previous week he had visited with Erwin Ritter in Houston and had gone over the project. Ritter told him at that time that the plans and specifications were in the architect's office; that Ron Ritter was the architect; and that the plans were in the computer, but that the electrical drawings were not quite com-

plete. After talking with Ron Ritter, Mr. Boggs informed Kendrick of the situation.

After receiving this information, Kendrick called Erwin Ritter and accused him of lying about the plans and specifications and told him that he did not want to do business with him any further. After a long conversation, they agreed that both he and Ron Ritter would come to Corpus Christi and have a conference with Boggs and Kendrick, and they agreed on a date for the meeting.

The Ritters failed to attend the meeting, and Kendrick learned from the management people at the Sunflower Terrace project that Ritter had told them that Kendrick and Ryan were not the owners of the project and that they would take their orders from him. Kendrick then suspected that something had gone wrong at the title company, and upon inquiry, learned for the first time that the Ritters had not signed the deed back to Sunflower Terrace.

Kendrick and Ryan then went to Houston and arranged a conference with Ritter at Likover's office. At the meeting and in the presence of Ron Ritter, Kendrick asked for the architectural plans and specifications, and a rolled up set of plans was given to him. Ryan also asked Ritter why he was not signing the deed. Ritter looked at Likover, who then stated that he understood that Ritter was still a partner in the project. Kendrick then showed Likover the written agreement and "just generally explained to Likover what had happened, to bring him up to date." On the advice of Likover, Erwin Ritter refused to sign the conveyance back to Sunflower Terrace. Kendrick testified that he then told them that obviously they were going to court, but asked, "if you have got a number that you want?" Likover and Ritter had a private conference, and at its conclusion, Likover told Kendrick that they wanted $400,000.

Kendrick and Ryan left, employed an attorney, and filed this suit. Subsequently, at a hearing on a temporary injunction, Mr. and Mrs. Ritter agreed to sign the deed to Sunflower Terrace, which they delivered some three weeks later.

In answer to the first five issues submitted, the jury found that Erwin Ritter committed common-law fraud, which was a proximate cause of injury to Sunflower Terrace, Ltd., and that his conduct was malicious. The jury also found that Erwin Ritter engaged in statutory fraud, which was a proximate cause of injury to Sunflower Terrace; that he was aware of the falsity of the representations that he made to Sunflower Terrace; and that Monique Ritter and Ron Ritter had actual awareness of, benefited by, and failed to disclose the falsity of the representation made by Erwin Ritter.

In answer to special issue number six, the jury found that Ron Ritter, Monique Ritter, Erwin Ritter, and Sanford Likover engaged in a civil conspiracy to defraud Sunflower Terrace that was a proximate cause of injury to Sunflower Terrace, and that each of them acted with malice with regard to the conspiracy.

In answer to special issue number 7(a), the jury found that Erwin Ritter, Monique Ritter, and Sanford Likover were part of a conspiracy to force Sunflower Terrace, Ltd., to act under duress, before a deed would be executed back to Sunflower Terrace, Ltd., and that this attempt was a proximate cause of injury to Sunflower Terrace. In answer to special issue 7(b), the jury found that Erwin Ritter, Monique Ritter, and Sanford Likover acted with malice with regard to that conspiracy.

In answer to special issue number 10, the jury found that the conduct of Ron Ritter, Erwin Ritter, Monique Ritter, and Sanford Likover, with regard to the sale of the Sunflower Terrace Apartments, constituted an unconscionable act or course of action, which was a producing cause of injury to Sunflower Terrace, Ltd., and in answer to special issue number 11, that they knowingly engaged in an unconscionable act or course of action.

By subsequent issues, the jury found that Monique and Erwin Ritter materially breached the September 30, 1983, agree-

ment in certain specifics and determined the amount of damages to be assessed against the defendants, as well as exemplary damages and attorney's fees.

Likover's first point of error is that the district court erred in entering judgment against him, because he was acting in the capacity of an attorney representing his client and as a matter of law, owed no duty to non-client third parties.

■ An attorney has no general duty to the opposing party, but he is liable for injuries to third parties when his conduct is fraudulent or malicious. He is not liable for breach of a duty to the third party, but he is liable for fraud. *Wilbourn v. Mostek Corp.*, 537 F.Supp. 302 (D.Colo.1982).

■ A lawyer is authorized to practice his profession, to advise his clients, and to interpose any defense or supposed defense, without making himself liable for damages. *Morris v. Bailey*, 398 S.W.2d 946 (Tex.Civ. App.—Austin 1966, writ ref'd n.r.e.); *Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex.Civ. App.1910, writ ref'd).

■ However, an attorney is liable if he knowingly commits a fraudulent act that injures a third person, or if he knowingly enters into a conspiracy to defraud a third person. *Hennigan v. Harris County*, 593 S.W.2d 380 (Tex.Civ.App.—Waco 1979, no writ). Over 100 years ago, the Supreme Court of Texas held that where a lawyer acting for his client participates in fraudulent activities, his action in so doing is "foreign to the duties of an attorney." *Poole v. Houston & T.C. Ry*, 58 Tex. 134, 137 (1882). The Court held that a lawyer could not shield himself from liability on the ground that he was an agent, because no one is justified on that ground in knowingly committing a willfull and premeditated fraud for another. *Id.* at 137–38.

The jury found that Sanford Likover engaged in a civil conspiracy with Ron Ritter, Monique Ritter, and Erwin Ritter to defraud Sunflower Terrace, and that the conspiracy was a proximate cause of injury to Sunflower Terrace, Ltd. Likover contends that there is no evidence or, in the alterna-

tive, insufficient evidence to support this finding. He raises no point of error complaining of the language of the special issue or the instructions accompanying it. In *Great National Life Insurance Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex.1964), the court said:

A civil action for a conspiracy will lie if the acts of the conspirators are not only malicious but without legal justification or excuse and are performed with the intent of injuring another or if the natural and necessary consequence of the acts is the oppression of an individual.

Significantly, the Court in the *Chapa* case said that the injury must result from an act committed in pursuit of a common design.

In order to hold Likover liable as a co-conspirator, the evidence must show that he had knowledge of the object and purpose of the conspiracy; that there was an understanding or agreement to inflict a wrong against, or injury on, Sunflower; that there was a meeting of minds on the object or cause of action; and that there was some mutual mental action coupled with an intent to commit the act that resulted in the injury. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854 (Tex.1968).

The jury also found that Sanford Likover, Erwin Ritter, and Monique Ritter were part of the conspiracy to force Sunflower Terrace, Ltd., to act under duress before the deed would be executed back to Sunflower Terrace, Ltd., and that this was a proximate cause of the injury to Sunflower Terrace, Ltd.

■ Economic coercion is generally considered to be a form of duress. Duress is a tort. One who sustains damage as a result of being subjected to duress may sue as a plaintiff against the wrongdoer. *Houston Authority of Dallas v. Hubbell*, 325 S.W.2d 880 (Tex.Civ.App.—Dallas 1959, writ ref'd n.r.e.); *see also Ladd v. Southern Cotton Press & Manufacturing Co.*, 53 Tex. 172 (1880).

In *Dale v. Simon*, 267 S.W. 467, 470 (Tex.Comm'n App.1924, opinion adopted), a case where the plaintiff was seeking to recover money allegedly paid under duress, the court said:

> But where the party making such demands has, or is supposed to have, the power to injure the business or property interests of the one upon whom such demand is made, without resort to the courts to enforce the demand, and threatens to do an act which would cause such injury, and which he has no right to do, and thereby induces compliance with his demand, against the will of such party through fear of injury to his business or property interests, such threats amount to duress, if it appears that the party making such demand and threat ought not in good conscience to retain the benefit received by reason thereof.

In all of the cases that have been brought to our attention, the plaintiff was seeking to recover money or property that he alleged was paid or delivered as a result of economic coercion. No case has been cited to us where the plaintiffs sued for the damage proximately caused by an unsuccessful attempt to exact money under duress. For example, in *Ward v. Scarborough*, 236 S.W. 434, 437 (Tex.Comm'n App. 1922, opinion adopted), the court stated that to constitute duress of property, the restraint must be imminent and such as to destroy free agency without present means of protection, but that duress is sufficiently demonstrated if it induces the particular person to perform some act that he is not legally bound to do and contrary to his will.

Sunflower did not succumb to the attempted economic compulsion. It paid nothing to the Ritters or to Likover in order to secure clear title to their land. The jury did not find that Likover and the Ritters were able to enforce their demands by reason of economic compulsion, but it did find that there was a conspiracy to force Sunflower Terrace to act under duress that caused injury to Sunflower Terrace.

■ There is sufficient evidence from which the jury could find an understanding or agreement between Erwin Ritter and Likover to force Sunflower to pay $400,000 to Ritter in settlement of his claim for breach of contract, which the jury found that Sunflower did not breach. There was a meeting of Likover's and Ritter's minds on the course of action to be taken in order to force this settlement. Ritter and his wife would refuse to clear the title to the Sunflower Terrace Apartments. Likover knew that the deed conveying the Sunflower Terrace Apartments back to the Ritters and Ryan was filed by mistake and that Ritter had previously conveyed his interest in these apartments to Sunflower Terrace, Ltd. During the meeting with Kendrick and Ryan at his office, Likover had the opportunity to read the contract between Sunflower Terrace and the Ritters. He was acquainted with the apartment project and had unsuccessfully tried to find investors who would join him in purchasing an interest in the project from the Ritters.

The jury could infer that Likover knew that a delay in making repairs to the project in accordance with HUD requirements could cause Sunflower Terrace, Ltd., serious financial loss. Likover testified that he advised the Ritters not to sign the deed back to Sunflower Terrace, because their refusal would act as a bit of "leverage" in settling the dispute over the contract for repairs. There was ample evidence that Likover's action, in advising the Ritters not to sign the deed, and the Ritters' action, in refusing to sign it, was without legal justification in that the natural and necessary consequences of these acts would be substantial injury to Sunflower Terrace, Ltd. These findings of the jury are sufficient to sustain a civil action for conspiracy against Likover and the damages proximately caused thereby. *See Great National Life Insurance Co. v. Chapa*, 377 S.W.2d at 635.

The evidence was sufficient to sustain the jury's finding that Monique and Erwin Ritter materially breached the September 30, 1983, agreement by failing to provide adequate blueprints, plans, and specifica-

tions for the rehabilitation of the Sunflower Terrace Apartments, and by asserting ownership in the apartment project after September 30, 1983, as well as by failing to enter into a construction contract. The jury's failure to find that Sunflower Terrace refused to enter into a construction contract with Erwin Ritter, as called for in the September 30, 1983, contract, is amply supported by the evidence.

There is, then, sufficient evidence to support a finding that the Ritters and Likover joined together in a conspiracy to exact money, to which they were not entitled, from Sunflower Terrace by refusing to reconvey title to Sunflower Terrace. Ms. Ubernoski, an employee of the title company that handled this transaction, testified that on October 7, the day she received the deeds from Kendrick, she called Ritter and told him that she had the correction deeds and that she needed his signature and that of his wife. On that same day, Ritter consulted Likover about the matter. Two or three days later, she called Ritter again, and he told her that he and his wife would be signing the deed, but they did not. She called him several more times; finally, he came into the office and secured copies of the deed and told her to file one deed and that he would come in when his wife returned to town and sign the other one. Ritter met with Likover for a second time on October 8, and had two telephone conversations with him on October 11. In his testimony at trial, Likover agreed with the attorney for Sunflower Terrace that he "put it into Mr. Ritter's mind about using those deeds to accomplish those objectives that you and Mr. Ritter mutually agreed upon."

There is evidence that, during the negotiations on September 30, Ritter proposed that Ryan enter into a partnership with him to acquire the HUD project and that his corporation be given a contract to renovate the project for $1,200,000. There is evidence that Likover called Kendrick and Ryan thieves. The jury was entitled to conclude that Likover considered that Kendrick and Ryan had driven a hard bargain,

since Ritter was desperate and was about to lose his entire investment in the project.

Though Likover testified that he merely gave legal advice to a client, based on the facts as related to him by the client, the jury could infer from the testimony that Ritter's request to Ms. Ubernoski to file the deed from Sunflower Terrace to the Ritters and to Ryan without waiting for the execution by Ritter and his wife of the deed back to Sunflower Terrace, was part of a scheme to use economic compulsion to force Kendrick and Ryan to make concessions to Ritter to which he was not legally entitled. The jury could also have determined from the evidence that the action of Likover in conveying Ritter's offer to Kendrick and to Ryan to settle all matters in controversy for $400,000 was done in furtherance of a conspiracy. It was not necessary for the evidence to establish that Likover would participate in this $400,000.

■ Once a civil conspiracy is proven, each co-conspirator is responsible for the acts done by any of the conspirators in furtherance of the unlawful combination. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex.1979).

There is evidence to support the finding of the jury that Sanford Likover engaged in a civil conspiracy to defraud Sunflower Terrace, Ltd., and that the conspiracy was the proximate cause of injury to Sunflower Terrace, Ltd. This finding is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong.

We are not here concerned with whether Likover and the Ritters actually exerted duress on Sunflower Terrace, Ltd., or actually defrauded them. The findings are that there was a conspiracy to do these things and that the conspiracy resulted in injury. The jury's affirmative findings on these issues are fully supported by the evidence.

By points of error 15 through 20, appellant Likover contends that there is no evidence or insufficient evidence: that his conduct proximately caused any damages for additional interest, due to construction delays; that his conduct proximately caused

any damages for operating loss, due to construction delays; and that the jury's answers to special issues, finding that such delay caused Sunflower Terrace, Ltd., to suffer such damages, is contrary to the great weight and preponderance of the evidence. Likover makes no contention, by point of error in his brief or in his argument under the points asserted, that the amount of damages awarded by the jury, approximately $250,000, is not supported by the evidence. Rather, he contends that the evidence will not support an award of any amount for additional interest paid or operating loss sustained.

The jury was entitled to conclude from the evidence that Sunflower Terrace was unable to proceed with the renovation of the project for at least one month by reason of the Ritters' refusal to execute the deed based on the advice given them by Likover. During this time, they had to pay interest on a bank loan and also suffered operating losses. There was evidence that the operating losses were caused by the Ritters' refusal. This was a low income housing project subsidized by the United States Government. The Department of Housing and Urban Development required that Sunflower permit its tenants to remain in the apartment, paying a rental of no more than 25% of the tenant's income until the renovation began. Sunflower Terrace, Ltd., was entitled to no subsidy until the project was renovated. These points of error cannot be sustained.

■ An additional point of error, that the court erred in entering judgment based on the exemplary damages issue, because a finding that Likover acted with malice was against the great weight and preponderance of the evidence, is without merit, since a trial court is required to enter judgment on the verdict of the jury, even though such verdict is contrary to the great weight and preponderance of the evidence. Tex.R. Civ.P. 301; *see also Everman Corp. v. Haws & Garrett General Contractors, Inc.,* 578 S.W.2d 539 (Tex.Civ.App.—Fort Worth 1979, no writ). Likover further attacks the award of exemplary damages, for

the reason that actual damages had not been properly awarded, but this point cannot be sustained, because we have found that actual damages were properly awarded.

Likover asserts that the trial court erred in entering judgment based on the jury's response to the issue on exemplary damages, because there was no evidence or insufficient evidence upon which to base a finding that Likover acted with malice.

■ "Malice" is defined as ill will, bad or evil motive, or such gross indifference to or reckless disregard of the rights of others as will amount to a willful or wanton act. *Chandler State Bank v. Dorsey,* 618 S.W.2d 113, 116 (Tex.Civ.App.—Tyler 1981, no writ).

■ Likover testified that subsequent to October 7, and prior to October 30, 1983, Ritter furnished him a copy of the contract that he signed on September 30, the deed executed on that date, and the correction deeds. He testified that he advised Ritter not to convey the property back, after he knew that a mistake had been made in the title. He further testified that he knew how serious and expensive a title problem could be. Ms. Ubernoski had also called him, seeking his help in getting Erwin and Monique Ritter to sign the reconveyance. While he testified that he did not know that the deed back to Erwin Ritter, Monique Ritter, and Ryan had been filed at the suggestion of Ritter, he knew that it had been filed by mistake. Despite this knowledge, he encouraged Ritter to withhold his signature as a bargaining tool.

This evidence is sufficient to sustain a finding by the jury that Likover's actions in furtherance of the conspiracy were motivated by ill will, spite, evil motive, intent to harm, or conscious indifference to the rights of Sunflower Terrace, Ltd. The jury found that the amount of money that should be awarded to Sunflower Terrace as an example to others to deter or discourage future acts, and as a penalty or by way of punishment, in addition to the amount found as actual damages, was $400,000.

They were instructed not to include in the answer any damages for attorney's fees and court costs. Likover has not complained either by a point in his brief or in his prayer that the amount awarded is excessive or that a remittitur should be ordered. The point is not well founded.

Appellant Likover contends, by a point of error, that as a matter of law, there is no legal basis for an award of attorney's fees against him. The jury found that $75,000 would be the sum of money that would be reasonable and necessary attorney's fees for the services of Sunflower's attorney in the preparation and trial of the case in the district court, as well as the sums of money that would be reasonable and necessary for legal services in case of an appeal. The judgment awarded the sums found by the jury against the Ritters and Sanford Likover jointly and severally.

A consumer who "prevails" under the Deceptive Trade Practices Act, Tex. Bus. & Com. Code Ann. sec. 17.50(d) (Vernon Supp. 1985), may recover attorneys' fees. The jury found that Sanford Likover engaged in an unconscionable action or course of action with regard to the sale of the Sunflower Terrace Apartments; that this action or cause of action was committed knowingly; and that this conduct was a producing cause of injury to Sunflower Terrace Limited. These findings authorize the recovery of attorneys' fees. *International Armament Corp. v. King*, 686 S.W.2d 595 (Tex.1985).

The judgment rendered by the trial court imposed a constructive trust on cash in the amount of $50,000 that Sanford Likover received from the Ritters on February 2, 1984, and deposited in his trust account. The court then ordered Likover to transfer and convey possession of the money to Sunflower Terrace II, Ltd., in partial satisfaction of the judgment. This money was part of approximately $110,000 paid to defendant Ritter by appellee for certain architectural services, blueprints, and plans that Ritter had agreed to furnish. Proper architectural services, blueprints, and plans were not furnished, and the jury found that as a result, Sunflower Terrace, Ltd., was damaged in the amount of $48,000. Appellant Likover has asserted, without contradiction, that as a result of temporary orders entered by the trial court, the sum of $20,000 was deposited in the registry of the court, and that this sum has been withdrawn and paid to Sunflower Terrace, Ltd., in partial satisfaction of the judgment. The record reflects that at the time the judgment was entered the $50,000 was no longer held by Likover. The trial court erred in rendering judgment, imposing a constructive trust on the $50,000, and ordering it paid to Sunflower Terrace, Ltd. However, the $20,000 deposited in the registry was traced to the trust account, and the constructive trust could properly be imposed on that sum.

The provision in the trial court's judgment imposing a constructive trust on cash in the amount of $50,000 is modified so as to impose a constructive trust on cash in the amount of $20,000 previously deposited in the registry of the court. In all other respects, the judgment of the trial court is affirmed. All costs in the trial court and on appeal are charged against the appellant.