# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00699-CV

**Reagan National Advertising of Austin, Inc., Appellant**

**v.**

**Vincent Hazen, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
## NO. GN502688, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from a summary judgment that presents issues concerning the liability of an attorney to an opposing party for the attorney's actions in representing a client. Reagan National Advertising of Austin, Inc. ("Reagan") and brothers Melvin and Monroe Euers became embroiled in a dispute regarding two Reagan billboards located on property the Euerses then owned in Austin. Contending that Reagan had no valid lease in effect that authorized it to maintain the billboards on their property, the Euerses had the billboards removed on October 1, 2003. Reagan then sued the Euerses; the Euerses's real estate agent, Joe Willie McAllister; and Bill Dahleen, the individual who had removed the billboards. Reagan alleged that the Euerses breached the disputed lease agreement and that the defendants collectively were liable for conversion, trespass, "wrongful destruction to real property," tortious interference with Reagan's advertising contracts, conspiracy to commit criminal acts, and violations of section 93.002 of the property code.

As the litigation progressed, Reagan added attorney Vincent Hazen as a defendant. The Euerses had hired Hazen in June 2003 to advise them regarding the billboard dispute with Reagan, and Hazen had thereafter continued to represent them in the ensuing litigation. Reagan alleged that Hazen was personally liable in connection with the billboards' removal under the same theories as the Euerses's other co-defendants.[1] Hazen filed a motion for summary judgment as to all of Reagan's claims against him, relying on both traditional and no-evidence grounds. The cornerstone of Hazen's motion was the principle that an attorney is not liable to third parties for actions taken and advice given in representing a client.[2] The district court granted Hazen's motion. Subsequently, Reagan's claims against Hazen were severed from the litigation, making the summary judgment final. Reagan filed a motion for new trial and supplemental motion for new trial. The district court denied both motions by written order. Reagan appeals.

In four issues, Reagan disputes that Hazen met his summary-judgment burden on his traditional grounds, argues that it raised genuine issues of material fact that preclude summary judgment, and urges that the district court abused its discretion in overruling his new-trial motions. We will affirm the district court's judgment.

---

[1] The record on appeal contains evidence that Hazen had previously represented clients adverse to Reagan in similar disputes and that Reagan had previously threatened to sue Hazen personally if he did not accept a retainer and stop representing clients against it.

[2] In an effort to avoid having to withdraw from his representation of the Euerses and McAllister, Hazen had initially raised this argument through a special appearance. Reagan challenged Hazen's use of this procedural vehicle to raise the argument. The district court denied the special appearance. Consequently, Hazen appeared in the action and withdrew as counsel to the Euerses and McAllister.

## STANDARD OF REVIEW

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Hazen raised both "traditional" and "no-evidence" grounds in his motion for summary judgment. Under the former standard, summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. A defendant can establish his entitlement to summary judgment as to a cause of action asserted against him by conclusively negating at least one essential element of the cause of action or conclusively establishing each element of an affirmative defense to the cause of action. *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). If the movant can show that it is entitled to judgment as a matter of law, the burden shifts to the non-movant to present evidence raising a fact issue to avoid summary judgment. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-549 (Tex. 1985).

A no-evidence motion for summary judgment must be granted if, after an adequate time for discovery, (1) the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial, and (2) the non-movant fails to produce more than a scintilla of summary-judgment evidence raising a genuine issue of material fact on those elements. Tex. R. Civ. P. 166a(i). A no-evidence summary

3

judgment is essentially a directed verdict granted before trial, to which we apply a legal-sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003); *Perdue v. Patten Corp.*, 142 S.W.3d 596, 603 (Tex. App.—Austin 2004, no pet.). A no-evidence summary judgment will be sustained when: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *King Ranch*, 118 S.W.3d at 751. We view the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *Id.* (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). More than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *Id.* "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

Because the district court's order does not specify the grounds for its summary judgment, we must affirm the summary judgment if any of the theories presented to the district court are meritorious. *Knott*, 128 S.W.3d at 216.

## ANALYSIS

**Attorney immunity**

As a general rule, an attorney in Texas owes common-law duties in regard to his provision of legal services solely to his clients and others in privity with the attorney. *See McCamish, Martin, Brown & Loeffler v. Appling Interests*,

4

991 S.W.2d 787, 792 (Tex. 1999); *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). "Perhaps as an offshoot of [Texas] privity jurisprudence," *Alpert*, 178 S.W.3d at 405, Texas courts have long held that attorneys cannot be held civilly liable for damages to non-clients, under any theory of recovery, for actions taken in connection with representing a client. *Id.*

This doctrine—often termed "attorney immunity"—derives from the policy goal of protecting "[t]he public['s] . . . interest in 'loyal, faithful and aggressive representation by the legal profession . . . .'" *Bradt v. West*, 892 S.W.2d 56, 71 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (quoting *Maynard v. Caballero*, 752 S.W.2d 719, 721 (Tex. App.—El Paso 1988, writ denied)). It recognizes that "[i]f an attorney could be held liable to an opposing party for statements made or actions taken in the course of representing his client, he would be forced constantly to balance his own personal exposure against his client's best interest." *Alpert*, 178 S.W.3d at 405. To prevent such chilling of an attorney's faithful discharge of his "duty of zealously representing his clients within the bounds of the law," the attorney-immunity doctrine ensures that "[i]n fulfilling this duty, an attorney 'has the right to interpose any defense or supposed defense and make use of any right in behalf of such client or clients as [the attorney] deems proper and necessary, without making himself subject to liability in damages . . . .'" *Bradt*, 892 S.W.2d at 71 (quoting *Morris v. Bailey*, 398 S.W.2d 946, 947 (Tex. Civ. App.—Austin 1966, writ ref'd n.r.e.)); *see also Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex. Civ. App.—Dallas 1910, writ ref'd) (attorneys have the right "to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages"). Otherwise, it is feared that the risk of liability:

5

> would act as a severe and crippling deterrent to the ends of justice for the reason that a litigant might be denied a full development of his case if his attorney were subject to the threat of liability for defending his client's position to the best and fullest extent allowed by law, and availing his client of all rights to which he is entitled.

*Bradt*, 892 S.W.2d at 71.

This immunity applies even if the attorney's conduct is wrongful in the context of the underlying litigation. *Alpert*, 178 S.W.3d at 405-06. In other words, "[u]nder Texas law, attorneys cannot be held liable for wrongful litigation conduct." *Id.* at 406 (quoting *Renfroe v. Jones & Assoc.*, 947 S.W.2d 285, 288 (Tex. App.—Fort Worth 1997, writ denied)). For example, a third party has no independent cause of action against an attorney for filing motions in a lawsuit, even if the motions are frivolous, without merit, or incorrect "because making motions is conduct an attorney engages in as part of the discharge of his duties in representing a party in a lawsuit." *Bradt*, 892 S.W.2d at 72; s*ee Alpert*, 178 S.W.3d at 406. Instead, such matters are addressed through the court's powers to impose sanctions or contempt, or through professional disciplinary action. *See id*.

Whether immunity attaches turns on the type of conduct in which the lawyer is engaged, not whether the conduct was meritorious in the context of the underlying litigation. *Alpert*, 178 S.W.3d at 406; *Bradt*, 892 S.W.2d at 72. The types of conduct to which immunity applies are those involving "the office, professional training, skill, and authority of an attorney." *Miller v. Stonehenge/Fasa-Texas, JDC, L.P.*, 993 F. Supp. 461, 464 (N.D. Tex. 1998) (citing *Taco Bell Corp. v. Cracken*, 939 F. Supp. 528, 532 (N.D. Tex. 1996)) (applying Texas law).

6

However, as Reagan emphasizes, there are limits to a lawyer's protection from liability arising out of his representation of a client. *Alpert*, 178 S.W.3d at 406. For example, attorneys, like anyone else, are liable if they assault the opposing party or her lawyer, regardless whether doing so might advance their client's interests. *Bradt*, 892 S.W.2d at 72. Likewise, Texas courts have recognized an exception to the privilege when an attorney knowingly commits a fraudulent act outside the scope of his legal representation of the client. *See Toles v. Toles*, 113 S.W.3d 899, 911-13 (Tex. App.—Dallas 2003, no pet.); *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.—Houston [1st Dist.] 1985, no writ). If a lawyer participates in independently fraudulent activities, such actions are considered "foreign to the duties of an attorney" and he thus cannot shield himself from liability simply on the ground that he is an agent of his client. *Likover*, 696 S.W.2d at 472 (quoting *Poole v. Houston & T.C. Ry. Co.*, 58 Tex. 134, 137 (Tex. 1882)). Hazen acknowledges that this exception would apply to criminal conduct as well.

**Did Hazen meet his summary-judgment burden?**

Because attorney immunity is considered an affirmative defense, Hazen had the initial summary-judgment burden of establishing as a matter of law that his allegedly actionable conduct was undertaken in the legal representation of his clients, the Euerses and McAllister, and involved the office, professional training, skill and authority of an attorney. *See Brandt*, 892 S.W.2d at 72; *Miller*, 993 F. Supp. at 464. In its third issue, Reagan contends that Hazen failed to meet this burden.

7

In support of his summary-judgment motion, Hazen submitted affidavits from Melvin and Monroe Euers, Joe McAllister, and himself.[3] Hazen also submitted authenticated copies of correspondence between himself and Reagan or its counsel in connection with the billboard lease dispute.

The Euerses and McAllister testified that, in 2003, McAllister had been acting as the Eureses' real estate agent in dealing with property they owned at IH-35 and Slaughter Lane in Austin. McAllister explained that the group was negotiating to sell the property. "During negotiations to sell the Property," McAllister recounted, "Reagan . . . asserted a leasehold interest in the Property in connection with two billboard signs existing on the Property," which "generated a dispute between Reagan and the Euers[es] regarding whether the billboards would remain on the Property." The Euerses elaborated that the dispute concerned "whether Reagan had a lease" for the two billboards. The Euerses recounted that they, along with McAllister, hired Hazen "to represent [them] in various matters related to the Property including the dispute with Reagan over the billboards." The Euerses and McAllister all testified that Hazen thereafter "met with [them] to discuss the dispute with Reagan and provide legal advice to us relating to that dispute."

The Euerses and McAllister further averred that "[a]s a result of Reagan's position with respect to the billboards," the Euerses "took steps to make sure any leasehold interest Reagan claimed would be terminated and the billboards removed prior to the closing of a potential sale of

---

[3] The district court excluded some statements in Monroe and Melvin Euers's affidavits in response to Reagan's objections that the Euerses' subsequent deposition testimony raised questions as to their personal knowledge regarding those statements. Hazen does not complain of this ruling on appeal. The foregoing analysis relies solely on the portions of the affidavits that were in evidence.

the Property." The Euerses "asked Hazen, as our attorney, to draft and send a Notice of Termination to Reagan" and "as our attorney, to inform Reagan that we wanted the billboards removed and would consider them abandoned after the date of termination." On June 27, 2003, Hazen sent a letter to Billy Reagan, Jr., of Reagan stating his clients' position regarding the purported lease's validity and enforecability and gave notice to Reagan that any right it had to occupy the property would terminate on September 30, 2003:

> Dear Mr. Reagan:
>
> My firm represents Melvin and Monroe Euers, the owners of two tracts of real property located at the intersection of IH-35 and Slaughter Lane. It is my understanding that Reagan National Advertising of Austin, Inc. ("Reagan") currently has a billboard on each of the tracts of property. My client recently discovered that these billboards were originally placed on the property pursuant to a lease dated November 16, 1988, between Reagan and Norman Euers. As you may be aware, Norman Euers was the father of my clients, but he had no ownership interest in either tracts of the property.
>
> Regardless of the [sic] whether the lease with Norman Euers would have been enforceable, any lease that was in effect has since terminated. Wayne King, Reagan's agent approached Melvin Euers about signing a lease for the two billboards. At that time, Mr. Euers, in no uncertain terms, informed Mr. King that he would not sign any lease with Reagan and he instructed Reagan to remove the billboards. This instruction by Melvin Euers, one of the actual owners of the property, terminated any lease that may have been in effect.
>
> Immediately after Melvin Euers instructed Reagan to remove the billboards, Reagan covered the advertising on the billboards, acknowledging Mr. Euers' termination of any lease. However, even though any lease that Reagan may have had was already terminated, on October 1, 2002, Reagan tendered a check for one additional year's rent to Mr. Norman Euers. Norman Euers was deceased at the time and the check was deposited into a trust account into Norman Euers' Estate.

9

Regardless of the enforceablility of the original lease with Norman Euers, or the propriety of tendering a rent check on a terminated lease to a deceased individual who did not even own the property in question, any claim that Reagan may have to occupy the properties ends at midnight September 30, 2003.

THIS LETTER IS NOTICE THAT REAGAN'S OCCUPANCY OF THE PROPERTY UNDER ANY CLAIM IS TERMINATED EFFECTIVE SEPTEMBER 30, 2003.

Please make whatever arrangements are necessary to have the two billboard structures removed no later than the close of business on October 1, 2003. Please notify me, in writing, no later that the close of business on August 1, 2003, concerning the arrangements you have made to remove the billboards. If I do not hear from you, I will assume that you have abandoned the billboards and will proceed accordingly. Further, if it is necessary to litigate any matters related to these billboards, additional claims will be asserted and additional damages will be sought.

Reagan's attorney, Mitchell D. Savrick, responded in a letter dated August 1, 2003, in which he termed "ludicrous" Hazen's position that the lease was invalid and asserted that the current lease term expired on September 30, 2004, rather than September 30, 2003. He then cautioned:

You should also not assume abandonment. You are hereby put on notice that under no circumstances does Reagan intend, and will ever intend, to abandon the property unless such intent is expressly set forth in writing signed by an authorized Reagan officer. You should never assume abandonment by Reagan and your doing so may expos[e] your client and possibly others to liability if they act on such assumption.

10

In a reply letter to Savrick dated August 20, 2003, Hazen stated that, although he did not agree with Savrick's "assessment of the status of [Reagan's] billboards on the [the Euerses'] properties," he was writing "to see if an accommodation can be reached":

> As you acknowledge in your letter, even if everything you assert is correct, your client's alleged lease will expire on September 30, 2004. Therefore, under any circumstances, your client can only hope to enjoy one more year of revenue from the billboards.
>
> These properties have been in the Euers' family for quite some time. During that time, the value of the properties has appreciated significantly. My clients currently have the properties under contract to sell for a large sum of money, but the position you have taken in your August 1, 2003 letter could jeopardize that sale. Again we do not believe that the lease is enforceable at all, but in any event, it will expire on September 30, 2003. However, I have advised my clients that to enforce that position will likely involve litigation with Reagan, which I strongly counseled them against.
>
> Therefore, to avoid jeopardizing the sale of the property and to avoid litigation with Reagan, my clients have authorized me to make the following offer:
>
> 1. The Euers will pay Reagan the profit it would have realized under the alleged lease from October 1, 2003 to September 30, 2004;
>
> 2. The Euers will waive any claim they have against Reagan for the years that Reagan has maintained billboards on the property without paying rent to the owners of the property; and
>
> 3. Reagan will voluntarily remove the billboards from the properties on September 30, 2003, or on such other date as agreed by the parties.

11

Hazen concluded:

> If your client is amenable to this offer, please provide me with copies of the advertising contracts, or other acceptable documentation, demonstrating the revenue Reagan will have generated from the billboards from October 1, 2002 through September 30, 2003. . . .
>
> This offer will remain open until the close of business on August 29, 2003, unless earlier revoked.

Reagan did not respond to this letter and, as all four witnesses averred, "did not remove the billboards."

All four witnesses testified that Hazen did not make any decisions regarding the course of action to take. The Euerses each testified that "Hazen made recommendations as to what we would do." The Euerses and McAllister agreed that the Euerses "elected to remove the billboards after consulting Hazen as a lawyer." The Euerses or McAllister hired Bill Dahleen to remove the billboards[4]; all agreed that "Hazen did not hire Dahleen." Monroe Euers and McAllister testified that, at Dahleen's request, McAllister asked Hazen, as their attorney, to draft an indemnity agreement that would indemnify Dahleen for any potential liability that Dahleen might incur as a result of removing the signs. Hazen drafted the indemnity agreement and delivered it to McAllister. From there, McAllister testified that the indemnity agreement was delivered to Dahleen and that "Hazen did not deliver the indemnity agreement to Dahleen." Hazen echoed that "I did not hire Dahleen, nor did I present the indemnity agreement to Dahleen."

---

[4] Monroe Euers stated that McAllister "hired" Dahleen, while McAllister states that the Euerses did. Melvin Euers testified that McAllister "arranged" for Dahleen to remove the billboards. However, all testified that "Hazen did not hire Dahleen."

12

Dahleen subsequently removed the billboards from the Euerses' property. McAllister testified that, "On behalf of the Euers, I provided payment to Dahleen for removing the billboards." On the morning of October 1, 2003, Hazen faxed a letter to Savrick stating:

> It is my understanding that this morning the billboards that were on the Euers' property have been taken down. It is my understanding that one of the billboards has been delivered to Reagan's yard at 9211 E. U.S. Highway 290 Austin, Texas 78724. Please let me know what you would like my clients to do with the other billboard.
>
> As we have discussed, my clients do not believe that Reagan had a valid lease for their property. Also, you know that my clients are presently under contract to sell the property and the presence of the billboards on the property could jeopardize that sale. My clients did offer to try to resolve this matter amicably, but when Reagan would not discuss an amicable resolution, my clients felt like they had no choice but to remove the billboards.
>
> However, my clients would still like to try and resolve this matter amicably. Even though my clients do not believe that Reagan ever had a valid lease, and certainly has no rights whatsoever with regard to the property after September 30th 2003, my clients are willing to offer Reagan one year's worth of profits on the billboards. Please provide us the documentation showing the profits for these billboards for the last year and my clients, in return for mutual releases, will pay Reagan for one year's profits on the billboards.
>
> Of course, if Reagan does not wish to resolve this dispute amicably, please understand that my clients will not only defend any lawsuit, but will seek all of Reagan's profits for the entire duration that Reagan operated on their property without a valid lease.

Savrick, Reagan's counsel, responded in a letter dated October 6, 2003:

13

Dear Vince:

As we discussed the other day, I was stunned you and your clients would commit such a wrongful act as dismantling Reagan National Advertising of Austin, Inc.'s sign without lawful process. In an attempt to minimize the damage caused by you and your clients, Reagan is in the process of trying to reinstall its signs on the property. Please confirm that neither you nor your clients will attempt to interfere with Reagan's efforts in this regard or to take any further vigilante steps. We hope to have the signs back up by the end of the week. From there, if you still believe Reagan has no right to possession, I suggest you take the appropriate steps to seek the appropriate judicial remedy.

Reagan subsequently filed suit against the Euerses, McAllister, and Dahleen. Hazen continued to represent the Euerses and McAllister until he was joined as a defendant. Hazen further averred:

My only involvement in the dispute at issue in this lawsuit has been as legal counsel for Melvin and Monroe Euers and Joe McAllister. I did not make any decisions regarding the course of action to take or personally participate in the removal of the billboards. I have only rendered advice and counsel to my clients as their attorney.

The Euerses and McAllister echoed that "Hazen's only involvement in the dispute that is the subject of this case has been as legal counsel" for them and that Hazen had not made the decisions as to what course of action the three would take. Monroe Euers and McAllister added that Hazen did not "personally participate in the removal of the billboards."

Hazen further testified that:

I have no interest in the property or the alleged lease that forms the basis of the dispute. I have not personally benefitted and will not personally benefit from the conduct of the parties in any other way other than the receipt of legal fees for my services as a lawyer for the Euers and McAllister.

14

Based on the evidence submitted with Hazen's motion for summary judgment, we find that Hazen met his burden of establishing as a matter of law that his allegedly actionable conduct was undertaken in the legal representation of his clients, the Euerses and McAllister, and involved the office, professional training, skill and authority of an attorney. *See Brandt*, 892 S.W.2d at 72; *Miller*, 993 F. Supp. at 464. Hazen's conduct involved providing legal advice regarding the billboard dispute, drafting an indemnity agreement, advocating his clients' interests to the opposing party and its counsel, attempting to negotiate an amicable resolution to the dispute, and ultimately representing his clients in the lawsuit Reagan later filed—acts that are quintessentially the types that are protected by attorney immunity. *See Brandt*, 892 S.W.2d at 72; *Miller*, 993 F. Supp. at 464.

In contending that Hazen failed to meet his burden, Reagan urges that the attorney-immunity doctrine applies solely to an attorney's conduct "in the context of litigation," and that Hazen's conduct is not protected because it "involve[d] . . . assisting [his] client in prior wrongful conduct," namely, "his client's illegal activities in removing [the] billboard[s]." We disagree that Hazen is not protected by attorney immunity merely because his complained-of conduct took place before Reagan filed its lawsuit. Hazen's summary-judgment evidence established that his alleged actions were in the context of an adversarial dispute in which litigation was contemplated, impending or actually ongoing. Moreover, while it is true that many of the cases addressing the attorney-immunity doctrine arise in the context of pending litigation, neither the case law, nor the doctrine's underlying policy rationales, are limited to that setting. *See James v. Brown*, 637 S.W.2d 914, 916-17 (Tex. 1982) (privilege against defamation claims applies to attorney statements "preliminary to a proposed judicial proceeding" that "has some relation" to the

15

proceeding); *Miller*, 993 F. Supp. at 464 (types of conduct to which immunity applies are those involving "the office, professional training, skill, and authority of an attorney"); *see also Dixon Fin. Servs., Ltd. v. Greenberg, Peden, Siegmyer & Oshman, P.C.*, No. 01-06-696-CV, 2008 Tex. App. LEXIS 2064, at **25-26 (Tex. App.—Houston [1st Dist.] Mar. 20, 2008, pet. denied) (applying attorney immunity to conduct "in an adversarial context" of "post-arbitration proceedings, an adversarial process similar to litigation" involving actions both prior to and during litigation).

Furthermore, the specific conduct of which Reagan complains—removing the billboards—is authorized by law as a non-judicial self-help remedy for landowners where, as was contended here, a tenant's property is abandoned or constitutes a trespass on the landowner's property. *See* Tex. Prop. Code Ann. § 93.002(e) (West 2007) ("A landlord may remove and store any property of a tenant that remains on premises that are abandoned."); Tex. Civ. Prac. & Rem. Code Ann. § 80.002 (West 2005) (failure of billboard owner to remove sign from premises after expiration of lease and within notice period constitutes a trespass). Reagan's theory against Hazen is ultimately a complaint that Hazen's clients, acting on his advice, were *incorrect* regarding the legal rights they asserted and the remedies to which they were entitled. However, the attorney-immunity doctrine applies regardless of whether these actions proved to be meritorious in the context of the dispute. *See Alpert*, 178 S.W.3d at 405-06 (observing that attorney immunity applies even if assertion of client's rights proved to be "meritless," "frivolous," or "wrongful" in the context of the underlying litigation); *Bradt*, 892 S.W.2d at 73 ("an attorney does not owe a duty to . . . the other side to ultimately be correct in his legal arguments"). Consequently, Reagan cannot, by attacking

16

the merits of the positions advanced by Hazen and his clients, circumvent the doctrine's application. *Taco Bell Corp.*, 939 F. Supp. at 533 (rejecting attempt to hold lawyer liable for "fraud" and "conspiracy" based on acts and omissions undertaken as part of the lawyer's discharge of duties in representing opposing party).

Relatedly, Reagan also asserts that Hazen had the burden, as summary-judgment movant, to affirmatively prove that the sign removal did not constitute a violation of criminal law so as to negate this "exception to the general rule" of attorney immunity. To the contrary, Reagan had the burden of raising a fact issue regarding this exception or counter-defense to Hazen's affirmative defense; Hazen did not have to prove a negative. *See Eckman v. Centennial Sav. Bank*, 784 S.W.2d 672, 675 (Tex. 1990); *Moore Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 936-37 (Tex. 1972).[5]

Concluding that Hazen met his burden of establishing his entitlement to judgment as a matter of law based on attorney immunity, we overrule Reagan's third issue. We now consider whether, as Reagan contends, it has avoided summary judgment by raising genuine issues of material fact.

**Did Reagan raise a genuine issue of material fact?**

Because Hazen met his summary-judgment burden as to his attorney-immunity defense, the burden shifted to Reagan to raise a fact issue to avoid summary judgment. *See Nixon*,

---

[5] Reagan relies upon *Mendoza v. Fleming*, 41 S.W.3d 781, 787 (Tex. App.—Corpus Christi 2001, no pet.), as support for a contrary proposition. To the extent that it provides such support, *Mendoza* is inconsistent with the Texas Supreme Court precedent discussed above.

690 S.W.2d at 548-49. Hazen also sought no-evidence summary judgment regarding the exception to the immunity, asserting the ground that "[t]here is no evidence . . . that Hazen either personally committed any fraudulent or criminal act or personally participated in a criminal or fraudulent act." In its first issue, Reagan contends that the district court erred in granting summary judgment because it raised genuine issues of material fact regarding whether Hazen was acting within his role as an attorney or was within the exception for fraudulent or illegal conduct. Similarly, in its fourth issue, Reagan contends that it has raised fact issues that defeat Hazen's no-evidence ground.

Much of Reagan's arguments in support of these issues turn on its characterization of the billboards' removal as criminal offenses. Based on that characterization, Reagan equates the services Hazen provided to his clients regarding the billboard dispute to an attorney's advising his client to kill the client's wife in order to avoid divorce proceedings and then hiring the hit man. Similarly, Reagan reasons that "even if the acts were done by Hazen as the Euers's attorney, he is not entitled to immunity because what the Euers were doing, with the assistance of their attorney, was improper, illegal, and outside the scope of judicial process." A flaw in these arguments is that Reagan, though it had the burden to do so, did not attempt to raise a fact issue as to whether the removal of the billboards was in fact a crime. As Hazen observes, Reagan offered no evidence that anyone associated with the billboards' removal was arrested, indicted, convicted, or had a criminal complaint filed against them, or that otherwise establishes that the billboard's removal constituted criminal conduct. Instead, Reagan relied on its erroneous assumption that Hazen had the burden to *dis*prove that the billboards' removal was a crime. The mere fact that the billboards were removed against Reagan's wishes does not alone raise a fact issue as to whether the removal

18

violated the law, as it is equally consistent on this record with the Euerses' assertion of a legally sanctioned self-help remedy to which they were entitled. *See City of Keller v. Wilson*, 168 S.W.3d 802, 813-14 (Tex. 2005) (explaining equal-inference rule). There is thus no evidence that the billboards' removal was a crime. *Id.*

Beyond this, Reagan cites various portions of deposition testimony in an attempt to raise a fact issue regarding whether Hazen was acting in his role as an attorney or engaging in illegal conduct. Reagan first points to the following deposition testimony of Melvin Euers:

> A:  We had a meeting and decided that the signs should come down.
>
> Q:  Who had a meeting?
>
> A:  Myself, my brother, Joe McAllister, and my attorney.
>
> Q:  Mr. Hazen? So the three of y'all or the four of y'all got together and decided you were going to take the signs down?
>
> A:  Yes.

In addition, Reagan cites to testimony of Monroe Euers in which, when asked for the name of "every person who participated in the planning or execution of this act," Euers included Hazen in his list.[6] None of this testimony raises a genuine issue of material fact that Hazen either acted outside his role as an attorney or personally engaged in criminal conduct. To the contrary, the

---

[6] Reagan also cites to testimony in which Euers states that "there were some bad decisions on this thing" and that it would not be "fair for Mr. Hazen to go home and not to have to answer for what he did." Euers' opinion as to Hazen's legal liability is not a material fact.

testimony is consistent with Hazen's evidence that he provided legal counsel to the Euerses and McAllister regarding the billboard dispute.

Reagan next emphasizes evidence that Hazen was physically present at the property sometime during the day when Dahleen was removing the billboards and that Hazen videotaped the scene. Reagan characterizes this evidence as demonstrating that Hazen "videotaped the scene as the signs were being removed." In fact, there is no evidence that Hazen videotaped the scene *while* the signs were being removed. Instead, the evidence was that Hazen videotaped the condition of the signs *before* they were removed. Such evidence-gathering in the context of a dispute regarding whether the signs had been abandoned is within the role of an attorney. As for Hazen's physical presence at the scene during the time they were being removed, this is a reference to Hazen's deposition testimony that he drove by the site on his way to work on October 1 to verify that the signs had been removed before sending Savrick the letter informing Reagan of that fact later that morning. Hazen's actions in surveying the scene during or after the sign's removal in preparation for a communication on behalf of his clients is no evidence that Hazen actually participated in the sign's removal, nor is it proof that he acted beyond the role of an attorney or personally engaged in illegal conduct. *See Alpert*, 178 S.W.3d at 406.

Reagan also contends that the evidence presents fact issues regarding the degree of contact Hazen had with Dahleen. In his affidavit, Hazen testified that:

> On behalf of my clients and in my role as the attorney for the Euers, on one occasion I spoke with Dahleen briefly by telephone regarding the terms of the indemnity agreement. I did not hire Dahleen, nor did I present the indemnity agreement to Dahleen. I forwarded the proposed indemnity agreement to my clients for review and had no further dealings with it.

20

Reagan points to evidence of Hazen's time sheets, which, it contends, show that Hazen had as many as six phone conversations with Dahleen. It also contends that the following deposition testimony of Monroe Euers raises a fact issue regarding whether Hazen had actually initiated contact with Dahleen and how the indemnity agreement was forwarded to Dahleen:

> Q. I understand. And that's what I'm trying to figure out her [sic] is, who made it happen, so to speak. And I guess Mr. Hazen played a part in it, yes?
>
> A. I'm sure he played a part in it, yes.
>
> Q. Yeah. I mean, he's the person who called Mr. Dahleen. He told you that. Right?
>
> A. Yes. Yeah, he talked to - yes.
>
> Q. Drafted up this contract. Right?
>
> A. Yes.
>
> Q. Got you to sign it somehow. Correct?
>
> A. Correct.
>
> Q. He didn't forward it to you like he's telling the judge. Right?
>
> A. No.

Given Hazen's other controverted summary-judgment evidence, we conclude that any factual discrepancies that Reagan identified regarding the number of times Hazen spoke to Dahleen, who initiated contact with Dahleen, and how the indemnity agreement was transmitted to him are immaterial. *See CIGNA Ins. Co. v. TPG Store, Inc.*, 894 S.W.2d 431, 436 (Tex. App.—Austin 1995, no writ).

21

After reviewing the evidence presented by Reagan in response to Hazen's motion for summary judgment, we conclude that Reagan failed to raise a genuine issue of material fact as to whether Hazen acted outside his role as an attorney or engaged in illegal conduct. The district court did not err in granting summary judgment on both traditional and no-evidence grounds. We accordingly overrule Reagan's first and fourth issues.

**Motion for new trial**

In its second issue, Reagan argues that the district court abused its discretion in denying its motion for new trial because new evidence was discovered that disclosed for the first time the extent of Hazen's involvement in the removal of Reagan's billboards. Hazen responds that Reagan was not entitled to a new trial because he failed to satisfy any of the five factors required of the movant.

An appellate court reviews a motion for new trial based on newly discovered evidence under an abuse of discretion standard. *Trinity Indus. v. Ashland, Inc.*, 53 S.W.3d 852, 869 (Tex. App.—Austin 2001, pet. denied). The test for abuse of discretion is whether the trial court acted arbitrarily or without reference to guiding legal principles. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). To obtain a new trial based on newly-discovered evidence, a party must show: (1) admissible, competent evidence showing the existence of the newly discovered evidence; (2) the evidence has come to the party's attention since trial and the party had no notice of its existence before trial; (3) the party used due diligence to procure the evidence before trial; (4) the evidence is not merely cumulative of that already presented and does not tend only to impeach the testimony of the adversary; and (5) the evidence would probably produce a

22

different result if a new trial were granted.  *Connell Chevrolet Co. v. Leak*, 967 S.W.2d 888, 894 (Tex. App.—Austin 1998, no pet.).  We conclude that the district court did not abuse its discretion in concluding that Reagan did not meet this standard.

To support its motion for new trial, Reagan presented an affidavit that it obtained from Melvin Euers as part of its settlement with the Euerses.  Mr. Euers averred:

> Prior to making this statement I have asserted the Attorney-Client Privilege and have refuse [sic] to discuss my conversations with Vincent Hazen about the events discussed in this Affidavit.  I have now waived the Attorney-Client Privilege for these conversations;
>
> On or about the Summer of 2003, I consulted with Vincent Hazen to obtain advice about legal issues concerning the removal of various tenants and other occupants from my Property, near Interregional Highway 35 in Austin, Travis County, Texas;
>
> After writing a letter to Reagan National Advertising of Austin and requesting them to remove the advertising sign on my Property, Vincent Hazen recommended that I allow him to arrange for the removal of the signs, through a contractor that he knew, named Bill Dahleen.  Vincent Hazen contacted Bill Dahleen and arranged for the removal of the advertising signs.  I authorized Mr. Hazen to arrange the removal with Mr. Dahleen;
>
> Mr. Hazen accepted responsibility for arranging the details of sign removal, including the date and time of the removal, and issuing instructions to Bill Dahleen;
>
> Vincent Hazen never cautioned me that the the [sic] self-help removal of the signs would be a breach of the peace or a violation of the law;
>
> On October 1, 2003, Bill Dahleen removed the advertising sign from my Property.

According to Reagan, "[t]his newly disclosed information was directly contradictory to the evidence that Mr. Hazen previously submitted to the court in support of his summary judgment motion, including his own sworn affidavit." Hazen, however, argues that there was no new evidence submitted in Euers's affidavit. According to Hazen:

> By granting summary judgment, the Trial Court had already taken notice of Reagan's proffered summary judgment evidence as true, indulged every reasonable inference from such evidence in Reagan's favor, resolved all doubts in Reagan's favor and concluded that there was no genuine issue as to any material fact and that Hazen was entitled to judgment as a matter of law.

Hazen argues that, considering the record evidence along with the summary judgment standard, no new evidence was presented in Euers's affidavit. We agree.

As discussed in more detail above, Reagan presented summary judgment evidence that Hazen met with the Euerses and participated in the "planning and execution" of the signs' removal, contacted and possibly initiated contact with Dahleen, and prepared the indemnity agreement. The summary judgment standard of review required the trial court to take this evidence as true and to indulge every reasonable inference in its favor. *See Limestone Prods. Dist. v. McNamara*, 71 S.W.3d 308, 311 (Tex. 2002). Euers later statements that "Vincent Hazen recommended that I allow him to arrange for the removal of the signs, through a contractor that he knew, named Bill Dahleen" and that "Vincent Hazen contacted Bill Dahleen and arranged for the removal of the advertising signs" add nothing to evidence already presented that Hazen initiated contact and conferred with Dahleen. As we have already determined, such evidence is no evidence that Hazen was doing anything more than assisting his clients in protecting and asserting their rights

24

and no evidence that he was engaging in criminal conduct. For the same reasons, we conclude that this evidence, if considered, would probably not have produced a different result if a new trial had been granted.

We conclude that the district court did not abuse its discretion in concluding that Reagan did not meet its burden. We overrule Reagan's second issue.

## CONCLUSION

Having overruled Reagan's issues, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: July 29, 2008